## Richmond

### DENNIS WALDON STOCKTON

### V.

### COMMONWEALTH OF VIRGINIA

Record No. 831568.

March 9, 1984.

Present: All the Justices.

130

*Philip G. Gardner; Ward L. Armstrong (Gardner, Gardner & Barrow, P.C.;* Armstrong and Armstrong, on brief), for appellant.
*Todd E. LePage, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

STEPHENSON, J., delivered the opinion of the Court.

In a bifurcated jury trial conducted pursuant to Code §§ 19.2-264.3 and 264.4, Dennis Waldon Stockton was convicted of capital murder for willful, deliberate, and premeditated killing for hire, Code § 18.2-31(b), and his punishment was fixed at death. Following a sentencing hearing, the trial court imposed the death sentence. We have consolidated the automatic review of Stockton's death sentence with his appeal from his conviction, Code § 17-110.1 and 110.1F, and have given them priority on our docket. Code § 17-110.2.

The evidence will be viewed in the light most favorable to the Commonwealth. On July 25, 1978, 18-year-old Kenneth Arnder's partially decomposed body was discovered in a remote area of Surry County, North Carolina. Both of Arnder's hands had been cut off above the wrists, and he had been shot in the head. The

parties stipulated that his death was caused either by the gunshot wound to his head, by the severing of his hands, or by both means.

Arnder purchased drugs from one Tommy McBride in 1978. The drugs cost $500, but Arnder paid only $125 on delivery and promised to pay the balance later. When the payment was not forthcoming, McBride sought to have Arnder killed.

In June of 1978, Stockton was visiting at the home of Tommy McBride. In addition to McBride and Stockton, McBride's wife, Diane, Ronnie Tate, "Sunshine" Hatcher and Randy Bowman were present. At this time, McBride offered Bowman $1,500 to kill the "Arnder boy." Upon hearing this offer, Stockton told Mc-Bride that he needed money and would kill Arnder for McBride. Thereupon, the defendant and McBride entered a bedroom, and Bowman left McBride's house. Within the following "month or two," Bowman read of Kenneth Arnder's murder in a newspaper.

Wilma Arnder, the victim's mother, last saw her son alive on July 20, 1978, at her home in Mount Airy, North Carolina. Approximately 6:00 p.m. on that date, the defendant arrived at her home, and, a short time later, Kenneth departed with Stockton for Kibler Valley in Patrick County, Virginia. Stockton was taking Kenneth to the Kibler Valley "picnic area" to hide while "things cool[ed] off" regarding some stolen automobile wheels. Stockton told Wilma Arnder he would leave Kenneth at the picnic area and return there the following morning.

Ronnie Tate was with Stockton when Arnder was murdered. Stockton believed that Tate was talking about the murder and killed Tate to silence him. Robert Gates testified that in July, 1979, Stockton asked him if Ronnie Tate had been "running his mouth" about Kenneth Arnder. Although Ronnie Tate previously had told Gates that he and Stockton killed Arnder, Gates responded that Tate had not said anything to him about Arnder. Later that same day, Stockton, Gates, and Ronnie Tate went to Camp Civitan in Forsyth County, North Carolina, ostensibly to pick up ten pounds of marijuana. After arriving, Gates saw Stockton point a .38 caliber pistol at Tate's chest and heard Stockton accuse Tate of "running that damn mouth." Despite Tate's denials, Stockton insisted, saying, "I know, you been running your mouth about Kenny Arnder." Stockton then shot Tate through the chest.

The evidence showed that Stockton admitted killing Arnder. He made this admission on at least three separate occasions. First, in

early 1980, Stockton went to Fern and Michael Tate's home, looking for Michael Tate. When Fern informed him that Michael was not at home, Stockton became angry and told her that he and "Tate" had cut off someone's hands in Kibler Valley and that he had ways of taking care of people. Although Stockton did not explain who "Tate" was and gave no details, other evidence suggested he was referring to Ronnie Tate.

Next, in the Summer of 1980, Randy Bowman saw Stockton at the Surry County, North Carolina courthouse. Stockton was in a holding cell with three or four other prisoners. Bowman overheard Stockton talking about the Arnder case and related that Stockton said "he'd killed somebody and that somebody couldn't live with it, so he had to go ahead and kill him, too."

Finally, for approximately four months during 1980, the defendant and Ricky Williams were cell mates in the Surry County, North Carolina jail. During that time, Stockton told Williams he killed Kenneth Arnder because Arnder "had ripped somebody off for some drugs," and that the killing occurred in Patrick County, Virginia, at Kibler Valley. A short time later, during a fight, Stockton told Williams he had cut off Arnder's hands and threatened to do the same to Williams.

Testifying in his own defense, Stockton denied that he met with Tommy McBride and that McBride hired him to kill Arnder. He also denied killing Arnder. Diane McBride, Tommy McBride and "Sunshine" Hatcher each denied that Stockton met with them in June, 1978, and that Tommy McBride hired Stockton to murder Arnder. When Tommy McBride testified, he referred to Kenny Arnder as "Kenny Arrington."

Donald York, called as a rebuttal witness for the Commonwealth, testified that in 1982 he and Tommy McBride were cell mates. In early October, McBride told him that the "*Arrington* boy had ripped him off" (emphasis added) and that he had Stockton kill "Arrington."

Jay Gregory, an investigator with the Patrick County Sheriff's Department, had been assigned to investigate Arnder's murder. He testified concerning several conversations he had with Stockton. Stockton told Gregory that Kenneth Arnder "was getting his drugs from Tommy McBride," and that McBride, thinking Arnder had stolen drugs from him, offered Stockton $1,000 to kill Arnder. Stockton denied accepting McBride's offer, telling Gregory that Ronnie Tate and Bob Hershberger told him they had

taken the contract. Stockton explained to Gregory that he acquired the gun which killed Arnder from a trade with Hershberger. According to Stockton, he drove Hershberger to the McBride house a short time after Arnder was murdered. Hershberger came out of the house with $1,000, $100 of which he gave to Stockton because Stockton had provided him with transportation to McBride's.

## I. PRETRIAL PROCEEDINGS.

### A. *Constitutionality of the Death Penalty Statute.*

█ Stockton raises a number of constitutional challenges to the death penalty. He first contends that the death penalty is unconstitutional, *per se*, because it violates the proscription against cruel and unusual punishment as stated in the Eighth Amendment to the Federal Constitution. We have rejected an identical contention numerous times, and we affirm our previous decisions. *See Whitley* v. *Commonwealth*, 223 Va. 66, 77, 286 S.E.2d 162, 168-69 (1982), *cert. denied*, 459 U.S. 882 (1983); *Bassett* v. *Commonwealth*, 222 Va. 844, 851, 284 S.E.2d 844, 849 (1981), *cert. denied*, 456 U.S. 938 (1982); *Stamper* v. *Commonwealth*, 220 Va. 260, 267, 257 S.E.2d 808, 814 (1979), *cert. denied*, 445 U.S. 972 (1980); *Mason* v. *Commonwealth*, 219 Va. 1091, 1095, 254 S.E.2d 116, 118-19 (1979), *cert. denied*, 444 U.S. 919 (1979); *Waye* v. *Commonwealth*, 219 Va. 683, 698-99, 251 S.E.2d 202, 211-12 (1979), *cert. denied*, 442 U.S. 924 (1979); *Smith* v. *Commonwealth*, 219 Va. 455, 476, 248 S.E.2d 135, 148 (1978), *cert. denied*, 441 U.S. 967 (1979).

█ Next, Stockton contends that death by electrocution constitutes cruel and unusual punishment. He argues that "[e]lectrocution involves the senseless and barbaric infliction of needless pain and suffering." In *Martin* v. *Commonwealth*, 221 Va. 436, 439, 271 S.E.2d 123, 125 (1980), relying upon *In Re Kemmler*, 136 U.S. 436, 447-48 (1890), and *Hart* v. *Commonwealth*, 131 Va. 726, 743, 109 S.E. 582, 587 (1921), we rejected a similar argument, and we adhere to our previous holding.

█ Stockton also claims that the language of the statutes is vague and overbroad, using terms which are susceptible of arbitrary and irrational application (*e.g.*, "depravity of mind," "vileness," and "aggravated battery"), and permitting speculation and conjecture by a jury of laymen regarding future dangerousness,

"an area where even psychiatrists have proved inept." We previously have rejected the contention that the statutory language is vague and overbroad. *See Evans* v. *Commonwealth*, 222 Va. 766, 770, 284 S.E.2d 816, 817-18 (1981), *cert. denied*, 455 U.S. 1038 (1982); *James Dyral Briley* v. *Commonwealth*, 221 Va. 563, 580, 273 S.E.2d 57, 67 (1980).

In *Smith*, 219 Va. at 476-78, 248 S.E.2d at 149, we defined the terms "depravity of mind," "vileness," and "aggravated battery" and held that their application does not vest unbridled discretion in the sentencing body. We also defined "future dangerousness" and held that it supplies a sufficient standard for the sentencing body to predict future criminal conduct. *Id.* at 478, 248 S.E.2d at 148-49. *See Martin*, 221 Va. at 439-40, 271 S.E.2d at 126. Accordingly, we again reject the claim that the death penalty statutes are facially unconstitutional.

Finally, the defendant claims that Code § 18.2-31 is unconstitutional as applied to his case because it denies him due process and equal protection of the law. He argues that there is no rational basis for classifying murder for hire as a capital crime. We do not agree. In *Whitley*, 223 Va. at 77-78, 286 S.E.2d at 169, we rejected a claim that no rational basis exists for giving the death penalty in the seven classes of murder enumerated in Code § 18.2-31. *See also Clark* v. *Commonwealth*, 220 Va. 201, 212, 257 S.E.2d 784, 791 (1979), *cert. denied*, 444 U.S. 1049 (1980). In *Clark*, a murder for hire case, we specifically upheld the constitutionality of the statute. We hold, therefore, that the General Assembly's classification of murder for hire as a capital offense does not deny Stockton either due process or equal protection of the law.

## B. *Change of Venue.*

Stockton sought a change of venue, and the trial court conducted a hearing on his motion. The defendant presented a number of articles from newspapers having general circulation in Patrick County. He also testified that local television and radio stations had broadcast information similar to the newspaper articles.

All the broadcasts and articles, except three, related factual accounts of Stockton's prior convictions, the discovery of Tate's body, and Stockton's preliminary hearing, and none contained opinions regarding Stockton's guilt or innocence. The three excep-

tions were an article in the *Winston-Salem Journal* by Kenneth Haynes entitled "Meet Surry's Public Enemy No. 1," a letter written by Stockton to the editor of the *Mt. Airy News*, and a letter to the same editor written by the family of Ronnie Lee Tate.

The "Public Enemy No. 1" article, published in July, 1982, relates that the defendant embarked on a "life of crime" at age 16 and details his involvement in various serious offenses. Haynes reports that Stockton has been charged with two murders (Arnder and Tate) and he is under investigation in connection with two other deaths. According to the article, Stockton "has earned . . . the title of Surry County's public enemy No. 1." An unidentified "long-time officer" was quoted as saying: "There's as much of a story here to this man as there is to Charles Manson, if it could be told." Stockton's parole officer reportedly described Stockton as "an emotionless man," and a "great manipulator." According to the article, the parole officer concluded that Stockton had no conscience and said, "To me, personally, I think he could just smile at you and then shoot you."

Stockton's letter was in response to the "Public Enemy No. 1" article. It was self-serving and attempted to take issue with the article.

The letter from the Tate family was primarily an expression of sorrow over their loss and appreciation for the consideration shown them by certain law enforcement officers. It contained no accusatory or inflammatory language about Stockton.

Haynes, the author of "Public Enemy No. 1," was a witness at the pretrial hearing. While conceding the article could be prejudicial, he claimed the information was accurate and based upon reliable sources.

After presenting this evidence, Stockton's counsel requested the court to defer its ruling so they could provide additional evidence at the time of trial. The trial court granted counsel's request.

A venire of 20 was selected from the first 25 veniremen called. On the defendant's motion, one venireman was excused because of his friendship with a witness, and another was excluded because Stockton had been accused of shooting into a store she owned. A third, who previously dated Investigator Gregory, was excused on Stockton's motion. A fourth venireman would not consider the death penalty under any circumstances and was also excused. The

fifth venireman was excluded because she believed from what she had read in newspapers that Stockton was guilty.

After jury selection, Stockton introduced nine other newspaper accounts which were published during the two weeks between the pretrial hearing and commencement of the trial. These articles were factual in nature, dealing with either matters formerly published or accounts of pretrial proceedings. Stockton renewed his motion for a change of venue based upon all the evidence he had presented. The court denied the motion.

■ Change of venue is within the sound discretion of the trial court, and refusal to grant it will not constitute reversible error unless the record affirmatively shows an abuse of discretion. *Coleman* v. *Commonwealth*, 226 Va. 31, 45-46, 307 S.E.2d 864, 871 (1983); *Clanton* v. *Commonwealth*, 223 Va. 41, 50, 286 S.E.2d 172, 177 (1982); *Coppola* v. *Commonwealth*, 220 Va. 243, 247, 257 S.E.2d 797, 801 (1979), *cert. denied*, 444 U.S. 1103 (1980). There is a presumption that a defendant can receive a fair trial from the citizens of the county or city in which the offense occurred. To overcome this presumption, the accused has the burden of clearly showing "that there is such a widespread feeling of prejudice on the part of the citizenry as will be reasonably certain to prevent a fair and impartial trial." *Coppola*, 220 Va. at 248, 257 S.E.2d at 801. A showing of either extensive publicity or widespread knowledge of the crime or the accused is insufficient by itself to justify a change of venue. *Dobbert* v. *Florida*, 432 U.S. 282, 303 (1977); *LeVasseur* v. *Commonwealth*, 225 Va. 564, 577-78, 304 S.E.2d 644, 651 (1983), *cert. denied*, 104 S.Ct. 744 (1984); *Smith*, 219 Va. at 461-62, 248 S.E.2d at 140.

■ Stockton contends that there was widespread prejudice against him in Patrick County. To support his assertion, he points to the extensive media publicity. We do not believe the record supports this conclusion. Although the defendant's trial did attract considerable attention in the press, the articles, in the main, were factual in nature. The *voir dire* revealed no bias or prejudice toward Stockton. Indeed, it was only necessary to examine 25 prospective jurors to secure a panel of 20, and only one venireman was disqualified for having formed an opinion respecting Stockton's guilt.

The jury selection in the present case was considerably less difficult than in a number of other cases in which we held that the trial court had not abused its discretion in refusing a change of

venue. *See Coleman*, 226 Va. at 45, 307 S.E.2d at 871 (42 venire-men questioned, 14 excused because they had formed opinions as to guilt or innocence); *Clanton*, 223 Va. at 50, 286 S.E.2d at 176 (35 veniremen questioned, three disqualified because they had formed opinions); *James Dyral Briley*, 221 Va. at 570, 273 S.E.2d at 61 (46 veniremen examined, seven disqualified because they had formed opinions). We conclude, therefore, that the trial court did not abuse its discretion in overruling Stockton's motion for a change of venue.

## C. *Sequestration of the Jury.*

Stockton contends the trial court committed reversible error by refusing to sequester the jury. He moved for sequestration approx-imately six months before the trial, arguing that the case "will most certainly be a *cause celebre*" and the jury might be exposed to information outside the courtroom. The trial court overruled the motion because the jury had not yet been selected and the defendant was "merely speculating at this point." The motion to sequester was never renewed.

A trial court has wide discretion in deciding whether to sequester a jury. Its discretion extends to cases involving capital punishment. *Justus* v. *Commonwealth*, 222 Va. 667, 677, 283 S.E.2d 905, 910-11 (1981), *cert. denied*, 455 U.S. 983 (1982); *Turner* v. *Commonwealth*, 221 Va. 513, 525, 273 S.E.2d 36, 43 (1980).

At the time Stockton moved for sequestration, he had presented no evidence to support his motion. As the court noted, his argu-ment was mere speculation. Moreover, the newspaper articles in-dicating the defendant's case was the subject of considerable pub-licity were the only evidence ever produced to support the motion. The mere fact, however, that there has been media coverage does not require a trial court to sequester a jury. *Justus*, 222 Va. at 677, 283 S.E.2d at 910; *Turner*, 221 Va. at 525, 273 S.E.2d at 43.

Throughout the trial, the court meticulously admonished the jurors not to discuss the case with others or to expose them-selves to media coverage of the trial, and nothing in the record suggests that the jury disregarded this admonition. Under the facts and circumstances presented, we hold that the trial court did not abuse its discretion in refusing to sequester the jury.

## D. *Motion to Suppress.*

Stockton moved to suppress certain incriminating statements which he made to Investigator Gregory, claiming they were involuntary. The statements, which were related by Gregory at trial, contained Stockton's tangential acknowledgments that he was involved in the Arnder and Tate killings. Stockton asserts that he made the statements under the influence of drugs prescribed by a physician and, also, that they were obtained by Gregory's inducements and promises of special treatment. The trial court conducted a pretrial hearing on the motion.

A physician who treated Stockton while he was incarcerated prescribed antidepressants and tranquilizers to calm the defendant and control his aggressive tendencies and temper. While acknowledging that large doses of these drugs could affect a person's ability to make important decisions, he said Stockton always was able to function normally and that he appeared to be as "clear as a bell." He also stated that Stockton was not very sensitive to drugs, and it took a lot of drugs to affect him. The doctor had not prescribed large doses "considering the situation." He opined that the drugs he prescribed would not have caused Stockton to say or do anything involuntarily.

Gregory testified that while he dealt with the defendant he never appeared to be under the influence of drugs, but appeared to know what he was doing, and had no difficulty understanding Gregory's questions. Prior to each statement, Stockton was advised of his Constitutional rights, and he indicated he understood his rights and wished to make a statement.

During this time, Stockton furnished Gregory with information concerning unsolved crimes. Gregory informed Stockton that, in return for his assistance, the Commonwealth would recommend that he receive concurrent sentences in "stealing cases." No representations were made to Stockton, however, respecting recommendations by the Commonwealth for receiving information "in reference to any murders."

Occasionally, Gregory took Stockton out of jail for investigative purposes, and while investigating crimes, Gregory bought the defendant meals. On one occasion, Gregory lent the defendant money to purchase a radio. Stockton promptly repaid the loan when he received a reward for helping to solve a crime.

When the hearing ended, the trial court overruled Stockton's motion to suppress. The court found that neither the medication

nor Gregory's treatment of Stockton rendered any statements involuntary.

 The Commonwealth has the burden of proving by a preponderance of the evidence that a defendant's statements are voluntary. *Griggs* v. *Commonwealth*, 220 Va. 46, 49, 255 S.E.2d 475, 477 (1979). Admissibility is an issue for the court and not the jury, and the trial court must determine from the evidence whether the statements are voluntary. *Campbell* v. *Commonwealth*, 194 Va. 825, 830, 75 S.E.2d 468, 471 (1953). In so doing, the trial court evaluates the credibility of witnesses, resolves the conflicts in their testimony, and weighs the evidence as a whole. Its finding is entitled to the same weight on appeal as that accorded a factual finding by a jury and will not be disturbed unless it is plainly wrong. *Witt* v. *Commonwealth*, 215 Va. 670, 674-75, 212 S.E.2d 293, 296 (1975). *See also McFadden* v. *Commonwealth*, 225 Va. 103, 108, 300 S.E.2d 924, 926 (1983).

 The test to be applied in determining voluntariness is whether the statement is the "product of an essentially free and unconstrained choice by its maker," or, on the other hand, whether the maker's will "has been overborne and his capacity for self-determination critically impaired." *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 225 (1973). In determining whether an accused's will has been overborne, courts assess "the totality of all the surrounding circumstances." *Id.* at 226. For example, statements obtained during custodial interrogation while an accused is intoxicated are not *per se* involuntary. *Yarborough* v. *Commonwealth*, 217 Va. 971, 974, 234 S.E.2d 286, 289 (1977).

 We cannot say the trial court's finding of voluntariness is plainly wrong. Indeed, the finding clearly is supported by credible evidence. We hold, therefore, that it was not error to admit Stockton's statements.

### E. *Other Pretrial Matters.*

Stockton contends the trial court erred in refusing to appoint an investigator to assist his court-appointed counsel in preparing his defense. He argues that because "other judges in the Circuit had allowed funds for an investigator in less serious criminal cases," the court's refusal denied him due process and equal protection of the law. We do not agree.

 An indigent defendant has no constitutional right to the appointment, at public expense, of an investigator to assist in his

defense. *Martin*, 221 Va. at 446, 271 S.E.2d at 130. When a trial court employs an investigator at public expense, it is "an act of judicial grace not constitutionally required." *Quintana* v. *Commonwealth*, 224 Va. 127, 135, 295 S.E.2d 643, 646 (1982), *cert. denied*, 460 U.S. 1029 (1983).

Stockton's counsel moved for a continuance of his trial because they needed more time for preparation. Counsel claimed they could not render effective assistance without a continuance. The Commonwealth did not oppose the continuance, and the trial court granted the motion. Stockton, however, opposed the continuance, thereby putting himself at odds with his court-appointed counsel, and assigns error to the ruling.

This issue is wholly without merit. The orderly administration of justice requires that tactical matters, such as continuances, be left with counsel. Moreover, continuances rest within the sound discretion of the trial court. Stockton has not shown how the continuance prejudiced him. To the contrary, he clearly benefited from the continuance because it enabled his counsel to provide him with effective representation.

Stockton claims the trial judge erred in refusing to recuse himself because he had presided over a previous trial in which Stockton had cursed at him. In ruling on the defendant's motion, the trial judge stated that he knew of no reason why he could not give Stockton a fair and impartial trial. He also said that he had "no animosity" toward Stockton for any remarks Stockton may have made previously.

Nothing in the record suggests anything to the contrary, and, clearly, the judge did not abuse his discretion in overruling the motion. *See Justus*, 222 Va. at 672-73, 283 S.E.2d at 908 (trial judge did not abuse his discretion by retrying an accused after his capital murder conviction had been reversed); *Mason*, 219 Va. at 1096-97, 254 S.E.2d at 120 (trial judge did not abuse his discretion when he sentenced a capital murder defendant whom the judge had previously sentenced in 15 other non-capital felony cases).

## II. THE GUILT TRIAL.

### A. *Admissibility of Certain Evidence.*

Over defendant's objection, the trial court permitted the Commonwealth's witness, Robert Gates, to testify concerning the

Ronnie Tate murder. Gates knew both Stockton and Tate, and, in July, 1979, when Stockton asked him if Tate had been "running his mouth" about Kenny Arnder, Gates told Stockton that he had not heard Tate say anything. Later that day, at Camp Civitan in Forsyth County, North Carolina, Stockton pointed a .38 caliber pistol at Tate and accused him of "running his mouth" about Kenny Arnder. Tate denied the accusation, but Stockton accused him again and fatally shot Tate through the chest.

When Stockton testified, he denied killing Tate as related by Gates. Instead, he claimed that the killing occurred at Kibler Valley in Patrick County and that he acted in self-defense.

On rebuttal, Gates gave a more detailed account of the killing. He testified that after the first shot Tate begged for his life, and approximately five minutes later Stockton shot him again. After forcing Gates to dig the grave, Stockton jabbed the body with a posthole digger and rolled it into the grave. Stockton told Gates that he would "get the same . . . thing if [he] run [sic] [his] mouth."

Both at trial, and on appeal, Stockton argued that this evidence is more prejudicial than probative and unnecessarily interjected a second murder into the trial. The Commonwealth countered that the evidence is highly relevant and probative because it is connected to the crime charged and tends to prove the defendant's guilty knowledge.

As a general rule, evidence that the accused committed other crimes similar to the offense charged is inadmissible to prove the particular crime charged. *Kirkpatrick* v. *Commonwealth*, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970). This rule, however, is subject to well established exceptions:

Evidence of other offenses is . . . permissible in cases where the motive, intent or *knowledge of the accused is involved, or where the evidence is connected with or leads up to the offense for which the accused is on trial.* Also, testimony of other crimes is admissible where the other crimes constitute a part of the general scheme of which the crime charged is a part.

*Id.* (Emphasis added). The exceptions apply to offenses committed both before and after the offense for which the accused is charged. *Collins* v. *Commonwealth*, 226 Va. 223, 230, 307 S.E.2d 884, 888

(1983); *Moore* v. *Commonwealth*, 222 Va. 72, 76-77, 278 S.E.2d 822, 825 (1981); *Harris* v. *Commonwealth*, 211 Va. 742, 743-44, 180 S.E.2d 520, 522 (1971).

The only reasonable inference which can be drawn from Gates' testimony is that Tate knew Stockton killed Arnder, and Stockton, believing Tate was telling others about the murder, killed Tate to silence him. Clearly, the two offenses were interrelated, and Gates' testimony showed both Stockton's guilty knowledge of Arnder's murder and his desire to conceal his guilt. The conduct of an accused following the crime is often relevant, particularly when its purpose is to conceal his guilt. *Pearson* v. *Commonwealth*, 221 Va. 936, 946, 275 S.E.2d 893, 900 (1981).

Stockton virtually concedes that this evidence is probative. He argues, however, that its prejudicial effect far outweighs its probative value. We do not agree. Obviously, Gates' testimony was prejudicial to the accused, but this is the case with most prosecution evidence. We are of opinion, however, that the testimony was so relevant and probative to the truth-finding process that its probative value greatly outweighed any prejudicial effect. *See Lewis* v. *Commonwealth*, 225 Va. 497, 502, 303 S.E.2d 890, 893 (1983).

On direct examination, the Commonwealth's witness, Ricky Williams, stated that he volunteered to testify because he was "scared" of Stockton. The defendant objected on the ground that the evidence was "not probative." The trial court overruled the objection.

On appeal, however, Stockton argues that the evidence was inadmissible because Williams had not been cross-examined and his motive, if any, for testifying had not been questioned. Although Stockton appears to argue on appeal a ground not raised in the trial court, *see, e.g.*, *Langton* v. *Commonwealth*, 211 Va. 708, 709, 180 S.E.2d 524, 525 (1971), it is apparent that he did attack Williams' credibility on cross-examination, which had the effect of questioning his motive. Thus, any error, if properly preserved, was clearly harmless.

The court admitted into evidence three photographs, introduced by the Commonwealth, which showed the victim's dead body as it appeared when discovered. Stockton contends the photographs

were irrelevant and inflammatory.[1] He also argues that they were unnecessary because he had stipulated the manner and cause of the victim's death.

Admission of photographs is a matter resting within the sound discretion of a trial court, and its ruling will not be disturbed unless a clear abuse of discretion is shown. *Bunch* v. *Commonwealth*, 225 Va. 423, 436-37, 304 S.E.2d 271, 278 (1983), *cert. denied*, 464 U.S. 977 (1983); *Peterson* v. *Commonwealth*, 225 Va. 289, 294, 302 S.E.2d 520, 524 (1983); *Whitley*, 223 Va. at 74-75, 286 S.E.2d at 167; *Clanton*, 223 Va. at 51, 286 S.E.2d at 177-78; *Waye*, 219 Va. at 692, 251 S.E.2d at 208.

If photographs are "relevant and material to establish premeditation and malice and to show the degree of atrociousness of the crime," their admission does not constitute an abuse of discretion. *Brown* v. *Commonwealth*, 212 Va. 515, 519, 184 S.E.2d 786, 788-89 (1971), *vacated in part on other grounds and remanded*, 408 U.S. 940 (1972). *See also Bunch*, 225 Va. at 436-37, 304 S.E.2d at 278; *Whitley*, 223 Va. at 75, 286 S.E.2d at 167; *Waye*, 219 Va. at 692, 251 S.E.2d at 208; *Smith*, 219 Va. at 467-68, 248 S.E.2d at 143.

We find no abuse of discretion. The photographs, although graphic, were relevant because they tended to establish premeditation, malice, and the atrociousness of the crime. Moreover, the Commonwealth may not be precluded from introducing photographs by a defendant's stipulation of facts shown therein. *Clanton*, 223 Va. at 51, 286 S.E.2d at 177. *See also Bunch*, 225 Va. at 436-37, 304 S.E.2d at 278; *Peterson*, 225 Va. at 294, 302 S.E.2d at 524.[2]

---

[1] Stockton also contends that the photographs were inadmissible because they were not furnished to him prior to trial in accordance with a discovery agreement which he had with the Commonwealth. The record discloses, however, that the photographs were supplied to Stockton before being admitted into evidence, and he was given sufficient time to examine them. Therefore, we find no merit to this contention.

[2] Stockton raises two other assignments of error respecting the admissibility of evidence. Twice, he moved for a mistrial on the ground that certain testimony presented the previous day was inadmissible. The motions were untimely; therefore the challenged testimony was waived. *See Russo* v. *Commonwealth*, 207 Va. 251, 257, 148 S.E.2d 820, 825 (1966), *cert. denied*, 386 U.S. 909 (1967); Rule 5:21.

## B. *Jury Instruction Q.*

The defendant contends the trial court erred in refusing jury instruction Q, which read:

> The Court instructs the jury that if a reasonable doubt exists in your mind as to what role, if any, Stockton played in the death of Kenneth Arnder, you shall find him not guilty of capital murder.

The trial court rejected the instruction, believing it was confusing and because other instructions which were given adequately covered the subject. We agree.

The court instructed the jury that the Commonwealth was required to prove beyond a reasonable doubt that Stockton killed Arnder, and if it failed to meet its burden of proof beyond a reasonable doubt, the jury should "find the defendant not guilty of capital murder." Moreover, the jury was instructed that the Commonwealth must "prove beyond a reasonable doubt that . . . Stockton personally inflicted the wounds which killed Kenneth Arnder," and if it had a reasonable doubt as to whether Stockton personally inflicted the fatal wounds, it could not find him guilty of capital murder. The jury also was instructed concerning first-degree murder, second-degree murder, and accessory after the fact.

Instruction Q was inartfully drafted and could have confused the jury. Assuming, however, it correctly stated the principle of law it sought to advance, the other instructions given adequately covered the same principle. When granted instructions fully and fairly cover a principle of law, a trial court does not abuse its discretion in refusing another instruction relating to the same legal principle. *Lincoln* v. *Commonwealth*, 217 Va. 370, 375, 228 S.E.2d 688, 691-92 (1976); *Asbury* v. *Commonwealth*, 211 Va. 101, 107, 175 S.E.2d 239, 243 (1970).

## C. *Sufficiency of the Evidence.*

Stockton contends the evidence is insufficient to support his conviction of capital murder. He argues that a reasonable doubt exists as a matter of law. We do not agree.

In determining the sufficiency of the evidence, we must view the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth. The

judgment should be affirmed "unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." Code § 8.01-680. *See Green* v. *Commonwealth*, 223 Va. 706, 712, 292 S.E.2d 605, 609 (1982); *Higginbotham* v. *Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).

Viewed in the light most favorable to the Commonwealth, the evidence and all reasonable inferences drawn therefrom support a finding by the jury, beyond a reasonable doubt, that Tommy McBride hired Stockton to kill Arnder and that, pursuant to their agreement, the defendant murdered Arnder. This conclusion is supported by the defendant's statements and actions linking him to the crime. He spoke of "cutting off someone's hands in Kibler Valley" when he talked with Fern Tate. He further implicated himself in his admissions to Ricky Williams.

Randy Bowman was present when Stockton accepted McBride's offer of money to have Arnder killed, and Bowman overheard the defendant admit that "he'd killed somebody and that somebody couldn't live with it, so he had to go ahead and kill him, too." Additionally, Stockton told Robert Gates that he suspected Ronnie Tate of "running his mouth" about Arnder's murder, and Gates was present when the defendant killed Tate to silence him.

Furthermore, Arnder was last seen alive on July 20, 1978, when he was in Stockton's company. When the victim's body was found five days later, it was obvious that he had been dead for a considerable period of time.

The evidence against Stockton, although mainly circumstantial, is overwhelming. Circumstantial evidence of guilt is sufficient to support a conviction when the Commonwealth's evidence excludes every reasonable hypothesis except guilt. *Stamper* v. *Commonwealth*, 220 Va. 260, 272, 257 S.E.2d 808, 817 (1979), *cert. denied*, 445 U.S. 972 (1979). Clearly, we cannot say the judgment of the trial court is plainly wrong or without evidence to support it.

### III. THE PENALTY TRIAL.

#### A. *Jury Instruction V.*

In the penalty trial, Stockton requested Jury Instruction V which stated that "none of the evidence [the jury] heard regarding the death of Ronnie Tate" could be considered in deciding the

defendant's punishment. Stockton contends the trial court erred in refusing the instruction. We do not agree.

In the penalty trial, "[t]he evidence presented may include *the circumstances surrounding the offense*, the history and background of the defendant, and facts in mitigation." *Quintana*, 224 Va. at 146-47, 295 S.E.2d at 653. (Emphasis added.) For reasons previously noted, evidence of the defendant's involvement in Tate's murder was highly probative of his guilt in the Arnder killing. We also believe this evidence was relevant to establish the probability that Stockton would commit future crimes of violence. Indeed, it was the most graphic evidence presented of "future dangerousness," and the trial court properly refused Instruction V.

### B. *Sufficiency of the Evidence.*

The evidence at the penalty trial consisted of stipulations between the Commonwealth and Stockton. The parties stipulated that Arnder suffered the fatal bullet wound "directly between the eyes," and that his hands were severed "in a violent manner by a chopping or a hacking method." In addition, Stockton's previous convictions of breaking and entering, grand larceny and shooting into an occupied building were introduced into evidence.

The defendant's mother and brother misunderstood the necessity of their presence in court to testify. The parties stipulated that their failure to appear was due to a misunderstanding and further stipulated to their testimony. Had the defendant's mother been present, she would have testified that she and her son always had a good relationship, that he was generous and loving with her, and that she loves him. The defendant's brother, Doug Stockton, would have testified that he and the defendant had a good, close relationship and Dennis helped him build his house. Doug Stockton also would have testified that the defendant suffered repeated physical abuse from his father during his childhood.

By its verdict recommending the death penalty, the jury found that "there is a probability that [Stockton] would commit criminal acts of violence that would constitute a continuing serious threat to society." The jury also found that "his conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind and aggravated battery to the victim."

The defendant's prior criminal record, especially his conviction for shooting into an occupied building, coupled with the evidence that he killed Tate to silence him, was sufficient to support the jury's finding that Stockton posed a continuing, serious threat to society. We also believe the evidence supports the finding that Stockton's conduct was outrageously vile, involving "depravity of mind" and "aggravated battery to the victim." We have defined depravity of mind as "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." *Smith*, 219 Va. at 478, 248 S.E.2d at 149. Aggravated battery is "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." *Id.* Clearly, the evidence of Stockton's conduct in committing the murder satisfied the vileness predicate for the death penalty.

## C. *Presentence Review by the Trial Court.*

Before sentencing, the trial court must direct a probation officer to make a thorough investigation of the defendant's history and "all other relevant facts." Code § 19.2-264.5. The statute also provides that after considering the report, the court, for good cause shown, may set aside the death sentence and impose a sentence of life imprisonment upon the defendant.

The sentencing order states that the court considered all the evidence in the case, the probation officer's report, the cross-examination of the probation officer, and additional facts presented by the defendant. Thereupon, the court imposed the death sentence. We conclude that the trial court fully discharged the mandates of Code § 19.2-264.5 and that there is no "good cause shown" in the record for the court to set aside the death sentence and impose, instead, life imprisonment.

## IV. POST-TRIAL MOTIONS.

After his conviction and sentence, Stockton moved for a new trial upon the following grounds: (1) after-discovered evidence, (2) misconduct of the Commonwealth's Attorney, and (3) suppression of exculpatory evidence. The trial court overruled the motion as to each ground alleged, and Stockton has assigned error to the rulings.

Stockton claims that Randy Bowman testified that Allen Smith was present at Tommy McBride's house when McBride offered to pay to have Arnder killed.[3] After trial, the defendant discovered that Smith was incarcerated in the Surry County, North Carolina jail. Stockton represented to the court that Smith would testify he was not at McBride's house when McBride hired someone to kill Arnder. The trial court refused to grant a new trial on the grounds that Smith's testimony was "merely cumulative, corroborative or collateral" to evidence previously presented and would not likely produce a different result.

▪ Motions for new trials based on after-discovered evidence are addressed to the sound discretion of the trial judge, are not looked upon with favor, are considered with special care and caution, and are awarded with great reluctance . . . . The applicant bears the burden to establish that the evidence (1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial.

*Odum* v. *Commonwealth*, 225 Va. 123, 130, 301 S.E.2d 145, 149 (1983) (citations omitted).

▪ We agree with the trial court's findings. The proffered evidence fails to satisfy both the third and fourth prongs of the test for granting a new trial based on after-discovered evidence. Smith's evidence would have been merely cumulative. Stockton and three other witnesses all testified that the meeting never took place and that Tommy McBride did not offer to hire someone to kill Arnder. Obviously, the jury believed Bowman's testimony and rejected the testimony of four witnesses contradicting him. Therefore, it also is not reasonable to believe that Smith's cumulative testimony would produce an opposite result at a new trial.

▪ Stockton bases his second ground for a new trial on alleged misconduct by the Commonwealth's Attorney. Shortly before McBride testified, he was indicted for Arnder's murder.

---

[3] The record does not indicate Bowman named Smith as one of the persons present at McBride's house, and Stockton asserts that "[t]his is an obvious inadvertent omission from the transcript." We must assume, however, that the record before us is correct.

The indictment was later dismissed. Stockton claims that the only reason the Commonwealth indicted McBride was to damage Stockton's credibility and impeach his testimony. The defendant claims that the Commonwealth never intended to bring McBride to trial, that the indictment was a "sham tantamount to a prostitution of the judicial system," and that the prosecution was guilty of misconduct which deprived Stockton of a fair trial.

To support his contention, Stockton presented an affidavit executed by McBride's attorney. The attorney stated that shortly after his appointment, the Commonwealth's Attorney advised him that the Commonwealth might move to dismiss (*nolle prosequi*) McBride's indictment so McBride could be prosecuted in North Carolina. The record discloses that, following Stockton's trial, the Commonwealth's Attorney successfully moved to dismiss the indictment.

The Commonwealth's Attorney filed an affidavit stating that Stockton's allegations were "totally untrue," and the indictment against McBride "was for one reason, and no other—to convict him of hiring Dennis Stockton to kill Kenny Arnder." The affidavit further stated that the Commonwealth moved to dismiss the indictment because it believed the crime could be prosecuted more successfully in North Carolina.

The judge concluded that Stockton failed to prove his allegations. He further noted that Stockton's contention was meritless because McBride was the principal in the case "and it seems to me that could have been argued whether [McBride] was indicted or not and . . . I have great difficulty seeing how [the indictment] in any way prejudiced Dennis Stockton in his trial."

We agree with the trial court's assessment of the issue. Clearly, in overruling the motion, the court did not abuse its discretion.

Stockton also sought a new trial on the ground that the Commonwealth suppressed exculpatory evidence. He claims that the Commonwealth knowingly permitted Ricky Williams falsely to testify that he had volunteered his testimony.

At a hearing on his motion, Stockton called Investigator Gregory. Gregory testified that Stockton had informed him that Williams was involved in another, unrelated murder, and as a result of this information, Gregory interviewed Williams regarding the other murder. Although Gregory did not tell Williams that Stockton was the informer, during the interview, Williams implicated Stockton in Arnder's murder.

Later, Gregory determined that Stockton's allegation against Williams was unfounded. Before Stockton's trial, Gregory advised the Commonwealth's Attorney that Williams had implicated Stockton in the murder of Arnder and that Stockton had claimed Williams was involved in an unrelated murder but the allegation against Williams was unfounded.

The standards governing nondisclosure of exculpatory evidence were stated in *Dozier* v. *Commonwealth*, 219 Va. 1113, 253 S.E.2d 655 (1979). One standard, applicable here, was first enunciated in *Mooney* v. *Holohan*, 294 U.S. 103 (1935), and discussed in *Dozier*:

> The *Mooney* situation is one where the prosecution knowingly uses perjured testimony. The rule in such case is that "a conviction . . . must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."

*Dozier*, 219 Va. at 1116, 253 S.E.2d at 658, (quoting *U.S.* v. *Agurs*, 427 U.S. 97, 103 (1976)). Stockton's evidence regarding the Commonwealth's questioning of Williams fails to establish that Williams lied when he stated he was testifying voluntarily.

Even if Williams' statement was false, we do not believe a new trial is warranted. "[W]hen the suppressed evidence 'goes only to the credibility of the witness,' " rather than to the issue of the defendant's guilt, the evidence is material only if the witness' reliability may determine the guilt or innocence of the defendant. *Id.* at 1118, 253 S.E.2d at 658.

Because Stockton also admitted to others that he killed Arnder (*e.g.*, Fern Tate, Randy Bowman and Robert Gates), Williams' testimony concerning Stockton's admissions was merely cumulative. Therefore, Stockton's guilt was not determined by Williams' reliability, and there is no "reasonable likelihood" that Williams' motive for testifying would have affected the judgment of the jury. Accordingly, we hold that the trial court did not abuse its discretion in refusing to grant a new trial.

## V. SENTENCE REVIEW.

Code § 17-110.1C requires us to consider and determine whether the death sentence was imposed under the influence of "passion, prejudice or any other arbitrary factor." We must also

decide whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

To support his contention that the sentence was imposed under improper influences, Stockton again relies upon the alleged prosecutory misconduct concerning McBride's indictment, the admission of evidence about the Tate murder, and the extensive pretrial publicity about the case which, according to Stockton, required a change of venue and sequestration of the jury.

We already have considered and rejected these contentions. Moreover, from a careful review of the entire record, we find nothing to suggest that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

We have affirmed sentences of death imposed upon findings of both dangerousness and vileness in these cases: *Smith* v. *Commonwealth*, 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied*, 441 U.S. 967 (1979); *Mason* v. *Commonwealth*, 219 Va. 1091, 254 S.E.2d 116, *cert. denied*, 444 U.S. 919 (1979); *Stamper* v. *Commonwealth*, 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied*, 445 U.S. 972 (1980); *Turner* v. *Commonwealth*, 221 Va. 513, 273 S.E.2d 36 (1980), *cert. denied*, 451 U.S. 1011 (1981); *Linwood Earl Briley* v. *Commonwealth*, 221 Va. 532, 273 S.E.2d 48 (1980), *cert. denied*, 451 U.S. 1031-32 (1981); *James Dyral Briley* v. *Commonwealth*, 221 Va. 563, 273 S.E.2d 57 (1980); *Clanton* v. *Commonwealth*, 223 Va. 41, 286 S.E.2d 172 (1982); *Quintana* v. *Commonwealth*, 224 Va. 127, 295 S.E.2d 643 (1982), *cert. denied*, 460 U.S. 1029 (1983); *Coleman* v. *Commonwealth*, 226 Va. 31, 307 S.E.2d 864 (1983).

We also have accumulated and considered the records of all capital felony cases reviewed by this Court since the enactment of the present statutes. From our review, we determine that the sentence of death imposed upon Stockton was not excessive or disproportionate to sentences generally imposed by other sentencing bodies in this jurisdiction for crimes of similar nature.

Specifically, we have upheld the death penalty in a murder for hire case, finding that the sentence was not disproportionate when no mitigating facts or circumstances were shown. *Clark* v. *Commonwealth*, 220 Va. 201, 220, 257 S.E.2d 784, 791 (1979). Stockton also has not shown any reason why his punishment is excessive or disproportionate. The single gunshot wound between Arnder's eyes is indicative of a deliberate, execution-type murder which

Stockton performed for a purely pecuniary motive. In addition, the mutilation of the victim's body was shocking.

We have found no reversible error in the trial court's rulings, and we have determined, based on our independent review, that the sentence of death was properly imposed. Accordingly, we will affirm the judgment of the trial court establishing guilt and imposing the sentence of death.

*Affirmed.*