COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Clements and Senior Judge Coleman
Argued at Richmond, Virginia


MICHAEL LEE SAMMONS

MEMORANDUM OPINION[*] BY
v.    Record No. 0089-00-2      JUDGE JEAN HARRISON CLEMENTS
                                        MAY 29, 2001
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
John F. Daffron, Jr., Judge

D. Gregory Carr (Bowen, Bryant, Champlin &
Carr, on brief), for appellant.

Eugene Murphy, Assistant Attorney General
(Mark L. Earley, Attorney General, on brief),
for appellee.


Appellant Michael Lee Sammons was convicted in a bench trial of first degree murder, use of a firearm in the commission of murder, robbery, and use of a firearm in the commission of robbery. On appeal, he contends the trial court erred in denying his motion to suppress inculpatory statements he gave to police. Finding no error, we affirm the judgment of the trial court.

As the parties are fully conversant with the record in this case and because this memorandum opinion carries no precedential value, this opinion recites only those facts necessary to a disposition of this appeal.

_____

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Specifically, Sammons asserts on appeal that the police, over a lengthy period of time in a cramped room, made numerous promises of leniency, applied psychological pressures, threatened to prosecute members of his fiancee's family, and led him to believe that his freedom or life depended on his cooperation with them. His inculpatory statements, he argues, were not voluntary and it was error, therefore, on the part of the trial court to deny his motion to suppress them.

On appeal from a trial court's denial of a motion to suppress, the burden is on the appellant to show that the denial of the motion constituted reversible error. See Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731, cert. denied, 449 U.S. 1017 (1980). We review the evidence in the light most favorable to the Commonwealth, granting to the Commonwealth all reasonable inferences fairly deducible from it. E.g., Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991).

"The Commonwealth has the burden to prove, by a preponderance of the evidence, that a defendant's confession was freely and voluntarily given." Bottenfield v. Commonwealth, 25 Va. App. 316, 323, 487 S.E.2d 883, 886 (1997). The voluntariness issue is a question of law requiring an independent determination on appeal. E.g., Wilson v. Commonwealth, 13 Va. App. 549, 551, 413 S.E.2d 655, 656 (1992). "In assessing voluntariness, the court must determine whether 'the statement is the product of an essentially

-

free and unconstrained choice by its maker, or . . . whether the maker's will has been overborne and his capacity for self-determination critically impaired.'"  Roberts v. Commonwealth, 18 Va. App. 554, 557, 445 S.E.2d 709, 711 (1994) (quoting Stockton v. Commonwealth, 227 Va. 124, 140, 314 S.E.2d 371, 381 (1984) (internal quotations omitted)).  In making that independent determination, "we are bound by the trial court's subsidiary factual findings unless those findings are plainly wrong."  Wilson, 13 Va. App. at 551, 413 S.E.2d at 656.  "Conflicts in evidence present factual questions that are to be resolved by the trial court," which "'must evaluate the credibility of the witnesses, resolve the conflicts in their testimony and weigh the evidence as a whole.'"  Mills v. Commonwealth, 14 Va. App. 459, 468, 418 S.E.2d 718, 723 (1992) (quoting Albert v. Commonwealth, 2 Va. App. 734, 738, 347 S.E.2d 534, 536 (1986)).

In determining voluntariness, we look to the "'totality of all the surrounding circumstances,' including the defendant's background, experience, mental and physical condition and the conduct of the police."  Commonwealth v. Peterson, 15 Va. App. 486, 488, 424 S.E.2d 722, 723 (1992) (citation omitted).  In considering the conduct of the police, we "must consider the interrogation techniques employed, including evidence of trickery and deceit, psychological pressure, threats or promises of leniency, and duration and circumstances of the interrogation."

-

Terrell v. Commonwealth, 12 Va. App. 285, 291, 403 S.E.2d 387, 390 (1991).

Here, Sammons was arrested and taken into custody by Chesterfield County police on January 16, 1998, for unrelated charges in a "church burglary."  After Sammons signed a waiver of his Miranda rights, he was interviewed by Detectives Truehart and Baker.  Truehart told Sammons,

> I expect you to tell me the truth.  I told you I'd be square with you and I'd help you to the fullest, didn't I?  If I catch you in a lie, I'm gonna hammer you.  And you got a baby coming here, be due, in what, a couple months.

After the officers questioned Sammons about the unrelated "church burglary," the interview shifted to the murder of James Lambrecht.  Sammons first asked what was going to happen to him, whether he would be going to jail or would "get off."  Truehart told Sammons he had no control over whether Sammons went to jail, but he would put in a "very good word" for him with the Commonwealth's attorney.  Truehart implored Sammons to tell him the truth, and Baker told Sammons it would help him a lot if he told them about the murder.  Truehart reminded Sammons again about the baby Sammons was expecting and told Sammons he needed to think of himself.  Thereafter, Sammons gave a version of the murder that implicated solely his codefendant, Jason Gregory.

Later during the same interview, Sammons asked for the officers' help, reminding them that he had a baby on the way.

-

Truehart responded that he was going to help Sammons and that Sammons had to look out for himself. Truehart also told Sammons that the more he did for the officers, the more they would do for him. Truehart further advised Sammons, "[Y]our life depends on you this moment and you got to tell us everything you know."

Later in the interview, Baker and Sammons engaged in the following exchange:

> Baker: Mike, we will help you out the best we can. We'll go to the Commonwealth's attorney and help you out the best we can. But we're going to need your help on this, too.
>
> Sammons: I will go to court and testify for you all, but I cannot go to jail. I will not be able to handle that mentally. Not again.
>
> Baker: Well, we can't tell you that you're not going to go to jail. Okay. That's not up to us. That's not our shot. You know what will happen. Right here today you'll have to go in front of the magistrate. And we can, we, Detective Truehart and I, will both go to the magistrate and tell that you've cooperated with us. But we can't make any promises to you. You know that.

Baker also implored Sammons to be totally honest and assured him that they knew Gregory was the "bad guy" and that they were "not looking to hammer" Sammons.

During the interview, the officers twice offered Sammons a drink and permitted him to go to the restroom when he requested to do so. Throughout the interview, Sammons blamed Gregory for the murder, insisting that Gregory had acted independently and that

-

Sammons was unaware of Gregory's intention to rob or kill Lambrecht.

Subsequently, Baker and Detective Steve Smith interviewed Sammons. Smith began the interview by accusing Sammons of having lied to the officers earlier. He told Sammons that Gregory had accused Sammons of shooting Lambrecht. Smith also implied that, if Sammons did not tell the truth, the police might have to involve Sammons's future father-in-law in the murder investigation and charge Sammons's fiancee's sister, who was in the car after the murder, as an accessory after the fact.

When Sammons refused to change his version of what happened, Smith, who knew from other evidence that Sammons was involved in the killing, told Sammons:

> Let me tell you something, son. You're lying. I'm telling you that straight up. Now do you want to face a capital murder charge, robbery, and death in result of a robbery? . . . Now let me tell you one more time. You better start telling the truth. If you don't, you're going to be the worst guy in this whole scenario.

Smith further told Sammons that a jury would not believe his inconsistent story and that he had better start "singing," because he was "digging [his] hole deeper."

When Smith and Baker suggested to Sammons that they knew where to get the gun Sammons used to shoot Lambrecht, Sammons confessed his part in the robbery and murder and apologized for

-

lying to the officers. At no time did Sammons seek to terminate the interview or talk to an attorney.

The record in this case contains a transcript of the initial interview with Sammons; an audiotape, videotape, and transcript of the second interview; and brief testimony of Detectives Smith and Baker regarding the second interview. Other than what is revealed in the transcript of the first interview, we have no record of the circumstances of that interview. Nor can we ascertain from the record when the second interview occurred or how long it continued, although the videotaped portion of that interview lasted no more than two hours, including breaks in the questioning. Sammons is seen smoking a cigarette during that interview.

At the suppression hearing, the trial court determined that, while the police "were alternately leaning on [Sammons], challenging his statements, telling him he was lying on matters, and . . . making other [vague and oblique charges] as to his [fiancee's] sister, to his potential father-in-law and to what may happen with him vis-à-vis the co-defendant," the police did not as a matter of law, overbear the will of the accused. Thus, the trial court concluded, even though it was the result of a "spirited interrogation," Sammons's confession was voluntary. We agree.

From our independent review of the record, we conclude that Sammons made no inculpatory statements to the police during the

-

first interview.  He was advised of his <u>Miranda</u> rights and chose to talk to the officers.  He was given breaks and a drink upon request.  At various points during the interview, the officers expressed their opinion that Sammons's cooperation and truthfulness would help him.  They advised Sammons that they would speak to those in authority on his behalf if he cooperated and told the truth.  But they further indicated they had no authority themselves to make any promises regarding the nature of the charges or their outcome.  In telling Sammons that he needed to think about his unborn child and himself, the detectives, who were unaware at the time of Sammons's role in the killing, were, it could reasonably be surmised, simply warning Sammons that he needed to take the interview seriously, as his answers would have an important effect on his and his future family's lives.

By the time the second interview commenced, the officers had obtained Gregory's version of the events, which incriminated Sammons.  The officers then used that information, along with other information from their investigation, to encourage Sammons to reveal his true involvement in the crimes.  In asking Sammons if he wanted "to face a capital murder charge," the police were, we believe, advising, rather than threatening, Sammons that Gregory, the suspected triggerman, was fingering Sammons as Lambrecht's killer.  Without the truth from Sammons, Gregory's version of the facts might prevail and Sammons might be prosecuted for capital murder.  The police further advised Sammons that, in

-

weighing his credibility, a jury might disbelieve him because he was telling so many versions of what occurred. Furthermore, the officers knew that one of the guns involved in the murder belonged to Sammons's future father-in-law and that Sammons's fiancee's sister, Victoria DeMaio, was a passenger in the car with Sammons and Gregory after the killing. This knowledge formed the basis of the officers' claims that Sammons, because he was being untruthful, was "dragging [his future father- and sister-in-law] into this."

Thus, in considering the totality of the circumstances, we hold that the officers merely persuaded, rather than coerced, Sammons to confess and that, as evidenced by Sammons's apology to the officers for his previous lies, Sammons's confession was voluntary. Hence, the trial court did not err in refusing to suppress Sammons's inculpatory statements.

Accordingly, we affirm the trial court's ruling denying Sammons's motion to suppress his confession and affirm appellant's convictions.

Affirmed.

-