# Richmond

## Thomas Carlton Wansley v. Commonwealth of Virginia.

### January 19, 1970.

### Record Nos. 6851 and 6852.

Present, Snead, C.J., I'Anson, Gordon, Harrison, Cochran and Harman, JJ.

*Philip J. Hirschkop; William M. Kunstler* (N.Y.) (*Charles M. L. Mangum; Arthur Kinoy* (N.Y.); *Cohen, Hirschkop, Hall* and *Jackson*, on brief), for plaintiff in error in Record Nos. 6851 and 6852.

*Gerald L. Baliles, Assistant Attorney General; Anthony F. Troy, Assistant Attorney General (Robert Y. Button, Attorney General; W. Luke Witt, Assistant Attorney General; Reno S. Harp, III, Assistant Attorney General and Edward J. White, Assistant Attorney*

*General,* on brief), for defendant in error in Record Nos. 6851 and 6852.

GORDON, J., delivered the opinion of the court.

This appeal follows Thomas C. Wansley's third trial, in March 1967, for the alleged rape and robbery of one Annie Carter.[1] The jury found Wansley guilty and imposed a life sentence for each offense. The trial court sentenced Wansley in accordance with the jury verdict for the rape, but reduced his sentence to twenty years imprisonment for the robbery.[2] Although defense counsel have assigned eighty-nine errors committed by the trial court, they have raised only two issues that we believe merit discussion.

1

## Did the Court Err in Failing
## to Grant a Change of Venue?

On December 9, 1962 the Lynchburg News reported that "a 17-year-old Lynchburg Negro, Thomas Carlton Wansley" had been arrested the previous day and charged "with the rape of two white women and the attempted rape of a third". The Lynchburg Chief of Police was quoted as saying that Wansley admitted that he had attempted to rape a white woman on November 6, that he had raped a white woman (Kyoko Fleshman) on November 14 and that he had raped a white woman (Annie Carter) on December 5:

---

[1] In February 1963 Wansley was tried for the alleged rape and robbery of Miss Carter. He was convicted and sentenced to death for the rape and to twenty years imprisonment for the robbery. We set aside those convictions and remanded the case for a new trial. *Wansley* v. *Commonwealth,* 205 Va. 419, 137 S.E.2d 870 (1964). Wansley was tried again in November 1965 for the robbery of Miss Carter. That trial resulted in a hung jury and mistrial.

In February 1963 Wansley was tried for and convicted of the rape of one Kyoko Fleshman. He was sentenced to death, but we set aside that conviction and remanded the case for a new trial. *Wansley* v. *Commonwealth,* 205 Va. 412, 137 S.E.2d 865 (1964). The case was not tried again because of the unavailability of the prosecutrix.

[2] The sentencing orders were entered June 5, 1967 and June 22, 1967. Petitions for writs of error to the rape and robbery convictions were filed October 5, 1967, argument in support of the petitions was heard November 28, 1967, writs were granted December 4, 1967, and the cases were argued and submitted at the November 1969 session. Contributing to the unusual delay between the granting of the writs and the submission of the cases were: defense counsel's delay in procuring and filing Wansley's affidavit of indigency, the printing of the 1,277-page record, and the granting of appellant's and appellee's requests for extensions of time for filing their briefs.

The newspaper also reported that, according to the Chief of Police, Wansley had accompanied officers "to the scenes of the crimes and pointed out the exact location of each act, together with the details". The Lynchburg Commonwealth's attorney was quoted as expressing to the Police Department the thanks of all Lynchburg citizens for "solving this horrible series of crimes recently committed upon several women of this community".

Later in December 1962 and in February 1963, when Wansley was tried for the Carter and Fleshman offenses, the Lynchburg News and the Lynchburg Daily Advance[3] published several articles that referred to his confession of guilt and to his reenactment of the crimes.[4]

After Wansley had been convicted of the Carter and Fleshman offenses and while appeals to this Court were pending, the Lynchburg News on March 8, 1963 reported: "William M. Kunstler, white New York City lawyer representing the second Negro attempting to enter the University of Mississippi, is now assisting in the Thomas Wansley case here". The Lynchburg Daily Advance made the same report, adding that Kunstler was "special counsel for the New York Gandhi Society of Human Relations".

On March 16, 1964, the Daily Advance reported:

"Kunstler, who previously has been associated in the defense of Wansley and who has been active in the Danville racial turmoil, is listed as a member of the National Lawyers Guild. The Danville Register printed a story last July 3 noting that the Lawyers Guild had been cited by the House Committee on Un-American Activities and that it has been thrice listed by Congressional committees as a Communist transmission belt."

Thereafter and up to and including March 1967, the month of Wansley's third trial, the Lynchburg News and Daily Advance made continual references to Kunstler. And they seldom, if ever, mentioned the name Kunstler without adding substantially these words:

---

[3] The News and The Daily Advance, published in the morning and evening respectively, are under common ownership and management.

[4] Only one article in the record before us intimates that Wansley had repudiated his confession. This article reports that, according to a psychiatrist, Wansley said he "might have been framed".

"who has been linked on numerous occasions with Communist-front organizations and efforts."[5]

Based primarily on the prejudicial newspaper accounts, defense counsel moved that the trial court order a change of venue of Wansley's third trial for the Carter rape and robbery.[6] The court overruled that motion, but sequestered the prospective jurors and permitted counsel to examine them individually.

The *voir dire* examination of the prospective jurors consumes about 450 pages of the printed record. Few objections were made to questions put by counsel, and very few objections were sustained—all correctly. Of the 59 prospective jurors who were examined, 38 were stricken for cause, 8 were stricken peremptorily, 12 were impaneled as jurors and 1 was accepted as alternate juror. Prospective jurors were stricken for cause for these reasons:

11—believed Wansley guilty because of newspaper articles, or were not sure they could put aside what they had read in the newspapers,

1—respected the Commonwealth's attorney more than Kunstler because of suggestions that Kunstler was a Communist,

6—were opposed to death penalty,[7]

---

[5] Several articles in the News and Daily Advance referred to accusations made by former Congressman William M. Tuck of Virginia, a member of the House Committee on Un-American Activities, that Kunstler was "less interested in the plight of the Negro race than he is in the Communists and their causes". Those articles also pointed out that Kunstler had not denied Tuck's accusations.

On March 8, 1967 the Daily Advance added an Editor's Note to an Associated Press report that Kunstler planned to file a suit on behalf of Adam Clayton Powell. The Editor's Note pointed out that Kunstler, who had been linked with "Communist-front organizations and efforts", had frequented Lynchburg as attorney for "twice convicted Negro rapist, Thomas C. Wansley".

On March 14, 1967, the day the *voir dire* examination at Wansley's third trial began, the Lynchburg News ran an article under the headline "Rape, Robbery Charges Face Wansley at Retrial". That article referred to Kunstler's links with "Communist-front organizations and efforts" and to his representation of Jack Ruby and Adam Clayton Powell. The article also stated that "civil rights agitator" Stokely Carmichael, who had spoken recently at a defense fund rally for Wansley, had advised Negroes to attend Wansley's trial "even if they must miss a day's work".

[6] Before Wansley's first trial for the Carter rape and robbery and before his second trial for the Carter robbery, defense counsel moved for a change of venue or, in the alternative, a change of venire. Before the third trial, counsel moved for a change of venue only.

[7] Wansley's third trial took place before *Witherspoon* v. *Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). *Witherspoon* is inapplicable to Wansley's case because the jury did not impose a death penalty. *Bumper* v. *North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

7—would give police officers' testimony more credence than the testimony of other persons,

2—had contributed to Wansley's defense fund,

1—would infer Wansley's guilt from his failure to testify,

1—had read transcript of previous trial,

1—was a friend of victim's family,

8—because of physical or mental condition, or age.

—

38

Defense counsel ask us to reverse Wansley's conviction because the trial court failed to grant a change of venue. Relying primarily on prejudicial newspaper accounts, counsel contend that Wansley was denied due process because of "[t]he inherent probability of prejudice in any jury drawn from the Lynchburg community" to try a Negro boy charged with the rape of a white woman.

Defense counsel refer, first, to the articles covering Wansley's arrest and the proceedings against him during the period December 1962-February 1963. They contend that by emphasizing Wansley's confession and reenactment of the crimes, those articles proclaimed Wansley's guilt.

Counsel lay greater stress on the repeated accusations that Kunstler was linked with "Communist-front organizations and efforts". Unlike the articles during the period December 1962-February 1963 referred to in the preceding paragraph, which were probably forgotten when Wansley was tried in March 1967, the Communist-link accusations continued up to the date of Wansley's third trial. By those accusations, counsel assert, the newspapers unjustifiably introduced charges of Communist affiliation into Wansley's trial.

The issue before us is not whether the articles in the Lynchburg paper relating to Wansley and his counsel were irresponsible, but whether irresponsible articles prevented Wansley from receiving a fair trial at the hands of impartial jurors. Defense counsel asks us to hold as a matter of law that Wansley did not receive a fair trial because of the "inherent probability" the jury was prejudiced.

To so hold would require us to ignore the *voir dire* examination. The trial court accepted twenty-one prospective jurors only after giving counsel wide latitude in questioning them and hearing their answers and observing their demeanor. The court excused each prospective juror who believed Wansley guilty or had doubt whether

he could erase what he had read in the newspapers, or who believed he would be affected by any connection Kunstler might have with Communism or Communist causes, or who would give a police officer's testimony more credence than the testimony of another person. And the court excused each prospective juror to whom counsel objected on a ground related to pretrial publicity.[8]

In *Beck* v. *Washington*, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), defense counsel made a contention like that now made by Wansley's counsel,

> "that such a strong case of adverse publicity [had] been proved that any jury selected in Seattle at the time [Beck] was tried must be held to be presumptively biased and that the trial court's adverse rulings on his motions for a change of venue . . . were therefore in error". *Id.* at 556, 82 S.Ct. at 963, 8 L.Ed.2d at 111.

But since in Beck the defense had not borne its burden of showing unfairness as a "demonstrable reality", rather than as "a matter of speculation", the Court refused to disturb the trial court's action in denying a change of venue. *Id.* at 558, 82 S.Ct. at 964, 8 L.Ed.2d at 112.

In *Beck* the Supreme Court concluded: "We cannot say the pretrial publicity was so intensive and extensive or the examination of the entire panel revealed such prejudice that a court could not believe the answers of the jurors and would be compelled to find bias or preformed opinion as a matter of law". *Id.* at 557, 82 S.Ct. at 964, 8 L.Ed.2d at 112. Similarly, we cannot find bias or preformed opinion as a matter of law in Wansley's case.

---

[8] Defense counsel made a general objection that the pretrial publicity linking Kunstler with Communist-front organizations precluded the selection of an impartial jury comprised of Lynchburg residents. Otherwise, defense counsel objected to the court's refusal to disqualify only four jurors. (1) One prospective juror was objected to because she testified "she would believe the testimony of a police officer, unless there was some other evidence put in to disprove him". (2) Another prospective juror was objected to on the basis of his testimony respecting the effect of the defendant's failure to take the stand. This prospective juror testified, however, that the defendant's failure to take the stand would not influence him in any way. (3) Another prospective juror was objected to because the Commonwealth's attorney argued, in his presence, that a question asked him by defense counsel was "repetitious", a "harassment of the anticipated juror". (4) Another prospective juror was objected to because he was a member of the Lynchburg Police Department twelve years before the trial.

With respect to the *voir dire* examination in the *Beck* case, the Supreme Court pointed out:

". . . Of the 52 [prospective jurors] so examined, only eight admitted bias or a preformed opinion as to petitioner's guilt and six others suggested they might be biased or might have formed an opinion—all of whom were excused. Every juror challenged for cause by petitioner's counsel was excused; in addition petitioner was given six peremptory challenges, all of which were exercised. Although most of the persons thus selected for the trial jury had been exposed to some of the publicity related above, each indicated that he was not biased, that he had formed no opinion as to petitioner's guilt which would require evidence to remove, and that he would enter the trial with an open mind disregarding anything he had read on the case."

*Id.* at 556-57, 82 S.Ct. at 963-64, 8 L.Ed.2d at 111.

The similarity to this case is striking, when we point out:

Of the 59 prospective jurors examined on the *voir dire* in this case, only eleven admitted bias or preformed opinion as to Wansley's guilt and one other respected the Commonwealth's attorney more than defense counsel because of suggestions that defense counsel was a Communist—all of whom were excused. Every juror challenged for cause by Wansley's counsel on a ground related to pretrial publicity was excused (see n. 8, *supra*); in addition petitioner was given four peremptory challenges, all of which were exercised. Although the persons thus selected for the trial jury had been exposed to some of the pretrial publicity related in this opinion, each indicated that he was not biased, that he had formed no opinion as to Wansley's guilt which would require evidence to remove, and that he would enter the trial with an open mind disregarding anything he had read on the case.

It is true, as pointed out by defense counsel, that in two cases the Supreme Court has dispensed with the requirement of proving identifiable prejudice to the accused. *Estes* v. *Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Sheppard* v. *Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Those cases, however, are quite different from this case.

In *Estes* the Supreme Court granted certiorari limited to the question whether Estes "was deprived of his right under the Fourteenth Amendment to due process by the televising and broadcasting of his trial". *Estes* v. *Texas, supra* at 534-35, 85 S.Ct. at 1628-29, 14 L.Ed.2d at 545. The Court recognized the general rule that identifiable prejudice to the accused must be shown in most cases involving claims of due process deprivation. Speaking in reference to the televising and broadcasting of the Estes trial, however, the Court said "at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process". *Id.* at 542-43, 85 S.Ct. at 1633, 14 L.Ed.2d at 550; *see Sheppard* v. *Maxwell, supra* at 352, 86 S.Ct. at 1517, 16 L.Ed.2d at 614.

In *Sheppard* the Court held that "the totality of circumstances in this case also warrants such an approach"—that is, the dispensing with the requirement of proof of identifiable prejudice. *Id.* The "totality of the circumstances" in *Sheppard* included prejudicial events or circumstances that were totally lacking in Wansley's trial: a televised three-day inquest, a carnival atmosphere in the courtroom at the trial, mere "suggestions" and "requests" by the judge that the jurors, who were not sequestered, refrain from exposing themselves to comment about the case, and the thrusting of jurors into the role of celebrities.

## II

### Did the Court Err in Admitting the Testimony of a Probation Officer Respecting an Admission Made by Wansley?

During the afternoon of December 8, 1962, the day Wansley was arrested, probation officer Lee A. Read went to the Lynchburg Police station where Wansley was in custody. Read introduced himself to Wansley, saying he was there "in his [Wansley's] behalf, since he was a juvenile".

Later that afternoon Wansley's mother, whom Read had called, came to the police station. Read "informed Mrs. Wansley that Thomas [Wansley] was in custody because he attacked a lady [Miss Carter] on Rivermont Avenue; and, also, had taken a pocketbook from her". Then he escorted her to the police lockup to see her son. According to Read's testimony, Wansley's mother asked Wansley,

when she arrived at the lockup, "Buddy, did you do it?", and Wansley replied "Yes".[9]

On cross-examination Read admitted he had told Wansley's mother that Wansley was charged not only with the Carter offenses, but also with the Fleshman rape and other offenses. When pressed for an explanation why he mentioned only the Carter offenses on direct examination, Read said that the Commonwealth's attorney had admonished him not to inject other offenses into the trial.

The trial judge first heard Read's testimony *in camera*, so that he might rule on its admissibility before the jury heard the testimony. At the conclusion of the *in camera* hearing, the judge ruled the evidence admissible as a declaration against interest.[10] Defense counsel objected to the judge's ruling on this ground:

> "Mr. Kunstler: In the *Kent* case, at the Supreme Court level, this term, they held that this very kind of thing that a juvenile officer is part of the interrogation family, he was present there, and it is he who is recounting the episode. He is a juvenile officer, assigned to protect the rights of this minor in the custody of the police. He fits under the *Escobedo* rule. The one recounting the statement is the police officer. He is the police officer here who is recounting the statement."

This objection was renewed when Read testified before the jury.

By the "*Kent* case", counsel may have intended to refer to *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). We do not read that case as indicating, however, that Read's testimony should not have been admitted in this case. In fact, defense counsel does not now rely upon that case as authority for rejecting his testimony. And *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), does not apply to this case. *Johnson v. New Jersey*, 384 U.S. 719, 733-34, 86 S.Ct. 1772, 1781, 16 L.Ed.2d 882, 892 (1966) (holding that *Escobedo* applies to a case where the suspect has requested and been denied an opportunity to consult with his lawyer).

---

[9] The record does not indicate that Read had questioned Wansley before this incident.

[10] Contrary to defense counsel's argument, we deem it unimportant that the trial court called Wansley's answer a declaration against interest, rather than an admission.

Defense counsel contend that the admitting of Read's testimony "violated Appellant's Fourteenth Amendment right of Due Process". In support of this contention, counsel argue in their brief that the constitutional safeguards surrounding the introduction of a confession are equally applicable to the introduction of the alleged admission made by Wansley. And they point out that more stringent safeguards surround the introduction of a confession by a juvenile, such as the 17-year-old Wansley, than a confession by an adult. Counsel then proceed to argue at length that Wansley's alleged admission was involuntary and wrongfully admitted under the constitutional standards laid down by the Supreme Court of the United States, citing, e.g., *In Re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *Miranda* v. *Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Davis* v. *North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); *Massiah* v. *United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *Haynes* v. *Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); and *Haley* v. *Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed.224 (1948).

Suffice it to say, in rejecting this contention, that counsel overlook or brush aside the fact that Wansley's spontaneous admission resulted from an unprompted question asked by his mother, not from questioning by Read or the police or any other person. None of the Supreme Court cases cited by counsel, or any other Supreme Court case of which we are aware, holds that the Constitution precludes evidence of an admission made by a juvenile or adult under those circumstances.

Defense counsel also contend, as they did in the trial court, that the admission of Read's testimony violated a pretrial order granting limited discovery. By an order entered January 16, 1967, the court had directed the Commonwealth's attorney to make available to defense counsel "statements of any alleged oral confessions by the accused upon which the Commonwealth will rely or put in evidence, and identification of all written confessions upon which the Commonwealth will rely and copies of same where not previously furnished".

We cannot say that the trial court erred in interpreting its pretrial order as not intended to refer to an admission like that testified to by Read. Moreover, the record does not show that the defense was prejudiced because counsel did not know before the trial about Read's proposed testimony. Defense counsel vigorously and exhaus-

tively cross-examined Read to bring out the facts necessary for the jury to determine intelligently whether Read's testimony about Wansley's admission should be believed and, if so, whether Wansley admitted his involvement in the Carter rape and robbery.

*Affirmed.*