Present:  All Justices

JEFFREY ALLEN THOMAS

                                              OPINION BY
v.  Record Nos. 012253 & 012254    JUSTICE ELIZABETH B. LACY
                                            March 1, 2002
COMMONWEALTH OF VIRGINIA

                FROM THE CIRCUIT COURT OF PULASKI COUNTY
                          Colin R. Gibb, Judge

      In this appeal, we review the capital murder conviction

and death penalty imposed upon Jeffrey Allen Thomas, along

with his convictions for attempted rape and use of a firearm

in the commission of a murder.

                        I.  PROCEEDINGS

      On June 26, 2000, Jeffery Allen Thomas was indicted by a

Pulaski County grand jury for capital murder in the commission

of or subsequent to rape or attempted rape, Code § 18.2-31(5);

for rape[1] or attempted rape, Code §§ 18.2-61 and 18.2-67.5; and

for the use of a firearm in the commission of a murder, Code

§ 18.2-53.1.[2]  At the conclusion of the first stage of a

bifurcated jury trial conducted pursuant to Code §§ 19.2-264.3

and -264.4, the jury convicted Thomas of all offenses.  At the

penalty phase of the trial, the defendant chose not to present

---

[1] The charge of rape was struck by the trial court on March 8, 2001.

[2] Thomas was also indicted for possession of a firearm after having been previously convicted of a felony, Code § 18.2-308.2, but the trial court granted the defendant's motion to sever that indictment on the grounds that justice required separate trials pursuant to Rule 3A:10.

mitigation evidence.  The jury fixed Thomas' punishment at death for capital murder, based upon a predicate finding of "vileness," at ten years imprisonment for attempted rape, and at three years imprisonment for the use of a firearm in the commission of a felony.  Thomas elected to present evidence in mitigation at the sentencing hearing.  After reviewing this evidence and the post-sentence report, the trial court entered a final order on July 16, 2001 confirming the convictions and imposing the sentences recommended by the jury.

We have consolidated the automatic review of Thomas' death sentence with his appeal of the capital murder conviction in Record No. 012253, Code §§ 17-110.1(A) and -110.1(F), and have given them priority on the docket, Code § 17-110.2.  We have also certified from the Court of Appeals of Virginia Thomas' appeal of his non-capital convictions, Record No. 012254, and have consolidated the two records for consideration.

## II.  EVIDENCE

Pursuant to established principles of appellate review, we will view the evidence in the light most favorable to the Commonwealth.  Cheng v. Commonwealth, 240 Va. 26, 42, 393 S.E.2d 599, 608 (1990).  Tara Rose Munsey was a 16-year-old sophomore at Radford High School.  On the morning of January 25, 2000, the defendant Thomas had unsuccessfully tried to

2

reach Tara by telephone. He eventually talked with her and invited her to join him and another friend, James Moede, at Moede's apartment. Tara, some of her friends, Moede, and Thomas were at Moede's apartment smoking marijuana until about 2:30 p.m. when Tara left to go to work. When Tara drove away from the apartment, her friends observed Thomas follow Tara's car.

After Tara left Moede's apartment, she went to the bank and withdrew $5.00 from her savings account before reporting to work at a fast food restaurant. While at work, she received a telephone call from her father who asked her to meet him at a basketball game later that evening. Tara agreed to meet him. Around 8:00 p.m., on the way to the arranged meeting place, Tara's father saw her car in the restaurant's parking lot. He went into the restaurant only to learn that Tara had "clocked out" approximately 30 minutes earlier. Tara never met her father that evening.

Sixteen days later, on February 10, 2000, her snow-covered body was found below a railroad access road in a wooded ravine along the western bank of the New River near Parrott. Tara had been shot three times in the head and once in the chest. She was nude from the waist up. Forensic evidence established that the muzzle of the murder weapon, a .22 caliber Marlin rifle, had been held against her left

3

temple for one shot, in front of her left ear for another, and against the center of her chest for a third, but was unable to specify the muzzle placement of the third shot to her head. In addition to gunshot wounds, Tara had bruises on the left side of her jaw, her left arm, right leg, and upper left thigh.

At an interview on February 10, which had been scheduled before Tara's body was discovered, Thomas told the police that he had spent the night of January 25 at Kevin Williams' house. When asked if he had been to the railroad tracks lately, Thomas replied that he had not "killed nobody."

When Pulaski Police interviewed Kevin Williams on February 12, 2000, Williams said Thomas did not spend the night at Williams' house on January 25. Williams also told the police that he owned a .22 caliber Marlin rifle that he had left in Thomas' car some time between December 6, 1999 and January 30, 2000. Williams said that he did not want to carry the gun up his icy driveway and that Thomas offered to "take care of it." Although Thomas promised to return the rifle, he never did. When asked about Williams' rifle in his February 10, 2000 interview, Thomas stated that he had given the rifle to a mutual friend, Leonard Dalton, to return to Williams.

Using evidence collected from the crime scene in conjunction with the interviews of Williams and Thomas, the

police obtained a warrant on February 15, 2000 to search Thomas' car and to recover blood, clothing, saliva, and hair samples from his person. The police executed the search on February 16, 2000 and collected ten loose hairs from Thomas' car, various other physical samples, and Thomas' shoes.

The physical evidence recovered from the crime scene included cigarette butts, Tara's coat and shirt, her car keys, and a .22 caliber shell casing. A firearms expert determined that two of the bullets recovered in the autopsy of Tara had been fired from a .22 caliber rifle manufactured by Marlin. Comparison of the shell casing with shell casings found near Kevin Williams' porch showed that they had been fired from the same rifle. Two partial shoe impressions found on Tara's shirt matched the pattern on the sole of the right shoe recovered from Thomas.

A trace evidence expert testified that three of the hairs recovered from Thomas' car were consistent with Tara's hair. Expert testimony also established that the DNA markers of the hair were consistent with Tara's genetic markers and that the genetic material found on the partially smoked cigarette matched Thomas' DNA. DNA consistent with Thomas' DNA was also found on the bottom sole of Tara's right shoe, in the blood stains on Tara's clothes, in semen found on the front of Tara's underwear, and underneath her fingernails.

5

On February 15, 16, and 17, 2000, the police interviewed Barbara E. Helton. Thomas had been staying at Helton's house "intermittently" since the morning of January 26, 2000. In an interview on February 17th, Helton told police that Thomas confessed to her that he had killed Munsey. She stated that Thomas came to her house at 6:30 a.m. on January 26, 2000 and woke her up. Thomas's clothes were wrinkled and his shoes muddy. He was nervous and asked Helton not to tell anyone he was there. Helton testified that Thomas told her that he "had just f----- up" and that he "wished he had done it a different way; that he didn't mean to do it." Continuing, Thomas told her that he had met Tara "at her job, and they went down the road to party a little bit, and he assumed she wanted sex." Thomas told Helton that they got into an argument near "a deserted spot . . . [t]hat had a ditch." During the argument, Tara "pushed" Thomas and "he pushed her, and she fell down." According to Helton, Thomas said that Tara "was on her hands and knees," when "he grabbed the gun from his side and shot her three times in the head." Thomas told Helton that he threw the gun "in some water."

On February 17, 2000, Thomas was served with two arrest warrants for capital murder and use of a firearm while committing capital murder. During a post-arrest interview with Pulaski County Sheriff A.J. Davis, Thomas stated that,

6

after leaving Moede's home on the afternoon of January 25, he followed Tara because she wanted to buy some marijuana from him, which he sold to her after she got some money from the bank. When Tara went to work, Thomas said he drove around. After making a statement that he had telephoned Williams, but Williams was not home, Thomas invoked his right to counsel and terminated the interview.

### III. ISSUES PREVIOUSLY DECIDED

Thomas raises 38 assignments of error. In Assignment of Error 11, Thomas advances a number of arguments regarding the constitutionality of the death penalty statutes and their application. The arguments raised by Thomas have been previously considered and rejected by this Court. Thomas presents no new arguments sufficient to warrant a change in our prior holdings:

> (1)  The penalty phase instructions adequately instructed the jury on the vileness aggravating factor and on consideration of mitigation evidence.[3]  Watkins v. Commonwealth, 229 Va. 469, 490-91, 331 S.E.2d 422, 438 (1985), cert. denied, 475 U.S. 1099 (1986).
> (2)  Consideration of hearsay evidence by the trial court in a post-sentencing report is not unconstitutional. Breard v. Commonwealth, 248

_____

[3] We do not address Thomas' arguments that the "future dangerousness" aggravating factor and the use of unadjudicated conduct on this point violated his federal and state constitutional rights because the jury verdict was limited to a finding of vileness, thereby rendering Thomas' arguments moot.

Va. 68, 76, 445 S.E.2d 670, 675-76, <u>cert.</u>
<u>denied</u>, 513 U.S. 971 (1994).

(3) The discretion granted a trial court to impose
a sentence of life is constitutional. <u>Goins</u>
<u>v. Commonwealth</u>, 251 Va. 442, 453, 470 S.E.2d
114, 122, <u>cert.</u> <u>denied</u>, 519 U.S. 887 (1996).


## IV.  BILL OF PARTICULARS

Thomas filed a motion for a bill of particulars asking
that the trial court order the Commonwealth to provide the
following information:  (1) the exact date, time and location
of the alleged murder; (2) the aggravating factors upon which
the Commonwealth would rely in seeking the death penalty; (3)
if "vileness" was to be a basis for seeking the death penalty,
the components of that factor upon which the Commonwealth
intended to offer evidence; (4) if "future dangerousness" was
to be a basis for seeking the death penalty, any unadjudicated
allegations of the defendant's misconduct upon which the
Commonwealth intended to offer evidence; and (5)
identification of the evidence upon which the Commonwealth
would rely to support the aggravating factors and all evidence
which the Commonwealth will introduce and rely upon to support
its contention that death is the appropriate punishment.  The
Commonwealth responded by providing the information requested
under items 2, 3, and 4, but maintained that it was not
required to provide the remaining information.  We agree with
the Commonwealth.

8

A defendant is not entitled to a bill of particulars as a matter of right. Quesinberry v. Commonwealth, 241 Va. 364, 372, 402 S.E.2d 218, 223, cert. denied, 502 U.S. 834 (1991). Code § 19.2-220 requires that the indictment identify the accused, describe the offense charged and where it occurred, and recite the date on or about which the offense occurred. This information was contained in the indictment at issue and Thomas does not challenge the sufficiency of the indictment. Accordingly, a bill of particulars was not required as to the first item requested. Strickler v. Commonwealth, 241 Va. 482, 490, 404 S.E.2d 227, 233, cert. denied, 502 U.S. 994 (1991).

We have previously considered a request for a bill of particulars in which the defendant sought identification of evidence identical to that Thomas seeks in item 5 above. In Quesinberry, we concluded that identification of all evidence upon which the Commonwealth would rely in support of its contention that death was an appropriate penalty was not required because such a request was an improper attempt to expand the scope of discovery in a criminal case. 241 Va. at 372, 402 S.E.2d at 223. We find nothing in this record to support a different conclusion in this case.

For the above reasons, we reject this assignment of error.

## V. MOTION TO SUPPRESS

9

Thomas assigns error to the trial court's denial of his motion to suppress the evidence obtained pursuant to the search warrants issued on February 16, 2000. The evidence obtained included hairs from Thomas' car, samples of his blood, hair and saliva, a pair of his tennis shoes, and some of his clothes.

The Affidavit for Search Warrant and the supporting attachment were executed by Captain Anthony R. Webb of the Pulaski County Sheriff's Office. The affidavit recited that Thomas was seen with Tara the afternoon of her disappearance and that she was killed by gunshot wounds from a .22 caliber firearm. Included in the affidavit was a statement that "[a] Commonwealth witness, Kevin Williams, has informed law enforcement that Thomas had borrowed a .22 caliber Marlin rifle from him in the fall of 1999" and that although Thomas "originally denied" that he had a firearm, when told of Williams' statement, "Thomas admitted that Williams had loaned him a .22 caliber Marlin rifle."[4]

_____

[4] The affidavit in its entirety follows:

*PROBABLE CAUSE*

Jeffrey Allen Thomas, hereafter Thomas, is the suspect in the homicide of Tara Rose Munsey, hereafter Munsey. Thomas knew Munsey and her family. Thomas was seen by several witnesses with Munsey in the afternoon of her disappearance on the

10

Thomas first argues that the affidavit was deficient

because the references to a "borrowed" and "loaned" firearm

---

day she is believed by investigators to have been killed, which is around or about the 25th day of January in the year 2000. On that day Thomas was driving a Gold colored 1991 Nissan Stanza registered through Virginia's DMV in his, Thomas', name.

Munsey's body was found in the Parrott area of Pulaski County. Her jacket was not on her body, and a T-shirt had been ripped and found a short distance away from her body. The outside temperature on January 25, 2000 was below freezing. Preliminary reports from the Forensic Science lab indicate Munsey was killed by more than one gunshot wound produced by a .22 caliber firearm. A shell casing from a Marlin .22 caliber firearm was found at the scene. Also, found at the scene is what appeared to investigators as footwear impressions appearing to be made by a tennis shoe, located on a particular piece of Munsey's clothing.

A Commonwealth witness, Kevin Williams, has informed law enforcement that Thomas had borrowed a .22 caliber Marlin rifle from him in the fall of 1999. A distinguishing characteristic of this particular firearm was a gold trigger. Thomas originally denied on several occasions that he had a firearm. When confronted with the information provided by Kevin Williams, Thomas admitted that Williams had loaned him a .22 caliber Marlin rifle.

Kevin Williams advised investigators that he had fired the .22 caliber Marlin rifle with a gold trigger from his porch/deck prior to his having loaned the firearm to Thomas. Investigators searched that area and found two shell casings between two planks of the deck. These shell casings were turned over to the forensic lab. It was determined that the shell casings recovered from the porch/deck of the Williams' residence, and the shell casing recovered from the crime scene were fired from the same firearm.

were false and misleading.  Williams told the police officers that he had "left" the rifle in Thomas' car and that Thomas had said he would "take care of it."  In his February 10, 2000 interview, Thomas told law enforcement officers that Williams had left the gun in Thomas' car but that he no longer had it because he had given it to Leonard M. Dalton, a friend, to return to Williams.

At an evidentiary hearing on Thomas' motion to suppress, Captain Webb testified that the affidavit was based upon his own interview with Williams and reports of other interviews by officers involved in the investigation.  Captain Webb stated that he believed that the statements he made in the affidavit were accurate, and that he did not intend to deceive the magistrate.  Major Mike Alderman testified that when he interviewed Thomas, Thomas stated that Williams had left the gun in Thomas' car and that Thomas had given the gun to Dalton to return it to Williams.  Alderman testified that he had informed Captain Webb of Thomas' statement prior to the time Webb prepared the affidavit.

Following the hearing, the trial court refused to suppress the evidence, finding that the affidavit "contained no deliberately false statements, nor was it the product of a reckless disregard for the truth."  Thomas asserts that this holding was error.

12

Thomas posits that because neither he nor Kevin Williams used the words "borrow" or "lend" in their reported interviews with law enforcement personnel and because Captain Webb knew they had used no such language in their interviews, Captain Webb's inclusion of these words in the affidavit constituted an intentional misrepresentation or reckless disregard for the truth.

The affidavit, apart from the disputed language, established that a shell casing found at the scene of the murder matched a shell casing fired from a gun owned by Williams.  The sentences at issue addressed Thomas' access to that gun.  While the words chosen by Captain Webb to describe how Thomas came into possession of Williams' gun did not accurately reflect the specific events leading to Thomas' possession of the gun as related by Thomas and Williams, the manner in which Thomas came into possession of the gun was not material to the fact that Thomas had access to and possession of the gun within a time period corresponding to the murder of Tara Munsey.  Whether the gun was "borrowed" or "lent" was not relevant to Thomas' access to nor possession of the gun for purposes of determining probable cause to issue a search warrant.

Similarly, Thomas' complaint that he possessed the gun during a period from December 1999 through January 2000 and

not sometime "in the fall" of 1999 as contained in the affidavit, does not alter the relevant fact of Thomas' possession of the gun at the time of Tara Munsey's murder.

Therefore, we conclude that there is no reversible error in the trial court's determination that there were no "deliberately false statements" in the affidavit and that the affidavit was not the "product of a reckless disregard for the truth."

Thomas next asserts that the affidavit was deficient because it omitted material information known to Captain Webb which would have defeated a finding of probable cause and because Webb received substantial portions of the information in the affidavit from an informant whose reliability was not adequately established. The record does not show the extent to which these arguments were before the trial court; however, neither has merit.

The information Thomas asserts was purposely omitted from the affidavit was evidence that shell casings from a .22 caliber rifle found at Thomas' former residence did not match the shell casings found at the scene of the crime or the shell casings fired from Williams' gun. This information was significant, Thomas claims, because law enforcement officers originally believed Williams' gun fired all three sets of shell casings. However, shell casings unrelated to the crime

14

are irrelevant to the determination that Thomas had access to the murder weapon and information about other such shell casings would not have defeated a finding of probable cause.

Finally, according to Thomas, the affidavit cannot support a finding of probable cause because the affidavit did not give the magistrate any information concerning the reliability of the "informant" Kevin Williams.  Kevin Williams, however, was identified in the affidavit and, therefore, was not a confidential or anonymous informant whose reliability had to be demonstrated.  See, generally, Illinois v. Gates, 462 U.S. 213 (1983); United States v. Khounsavanh, 113 F.3d 279 (1st Cir. 1997); United States v. Wilhelm, 80 F.3d 116 (4th Cir. 1996); United States v. Lalor, 996 F.2d 1578 (4th Cir. 1993).

Williams' information that Thomas had possession of the .22 caliber rifle was consistent with the statements of Thomas himself regarding possession of the rifle.  The only other information provided by Williams was that he had fired the .22 caliber rifle at a place where police found shell casings that matched those found at the crime scene.  There was little basis for suspecting that Williams' statement that he shot his gun at his home was unreliable.  Finally, Williams' statement connected him to the murder weapon.  Such potentially incriminating statements are normally considered as enhancing

15

the reliability of the statement.  See, e.g., Chandler v. Commonwealth, 249 Va. 270, 279, 455 S.E.2d 219, 224 (1995).

In summary, we hold that the trial court did not err in denying Thomas' motion to suppress the evidence because the affidavit accompanying the request for a search warrant was sufficient to support a finding of probable cause and did not contain deliberately misleading or false information, did not omit information which if included would have defeated a finding of probable cause, and was not based on information from a source not shown to be reliable.

### VI.  MOTION FOR CHANGE OF VENUE

Thomas filed a pretrial motion seeking to change venue arguing that the "barrage" of publicity surrounding his trial made it reasonably certain that he could not receive a fair trial in Pulaski County.  In support of his motion, Thomas produced over 111 articles appearing in the three newspapers serving the area and video tapes or transcripts of over 188 television reports relating to the crime.[5]  At the hearing on this motion, the trial court commented that Thomas had "provided the [c]ourt with plenty of material on which the

---

[5] Pulaski County is served by three newspapers:  The Roanoke Times, which serves 17 counties in southwest Virginia and has a daily circulation of 99,691; The Radford News Journal, which serves the City of Radford and has a daily circulation of 10,000; and The Southwest Times, which serves

16

[c]ourt could grant a change [in] venue" but that the motion was premature.  Relying on the presumption that an impartial jury could be impaneled, the trial court entered an order taking the motion under advisement pending the court's attempt to seat a jury.

Over 142 persons were summoned for voir dire which, although originally scheduled to take three days, lasted five days and delayed the scheduled start of the trial.  To produce a venire of 29, the trial court questioned 104 persons in panels of three.  Of those questioned, 95% of the potential jurors and all of the jurors ultimately seated were aware of the pretrial publicity and knew about the case.  While 73 persons were struck for cause, the reasons for the strikes were varied.  The record shows that in a number of instances a strike for cause was sustained on more than one ground.  For example, more than one potential juror indicated a lack of impartiality as well as a fixed opinion that the death penalty should or should not be imposed.  Nevertheless, 47 of those interviewed, or 45%, indicated that they could not be impartial and 33 of these had a fixed opinion that Thomas was guilty.

---

Pulaski County, east Wythe County, the City of Radford, and west Montgomery County and has a daily circulation of 7,500.

On the fourth day of voir dire, the trial court excused an individual who earlier had been interviewed and placed on the venire. During the intervening period, counsel and the trial court became aware that this individual had lied about his impartiality and had told a fellow worker that he would find Thomas guilty and, in his words, he would "fry the bastard."

Following voir dire, Thomas again moved for a change of venue. The trial court denied the motion, stating that "the law seems to indicate that what the court should do in situations like this is attempt to seat a jury, and if a jury can be seated or chosen, then that answers the question." Thomas assigns error to the trial court's denial of his motion to change venue.

We begin our review by reciting the principles which we apply when reviewing a challenge to the denial of a motion for a change of venue in a criminal case. First, there is a presumption that a defendant will receive a fair trial in the jurisdiction where the offense occurred and the defendant bears the burden of overcoming "this presumption by demonstrating that the feeling of prejudice on the part of the citizenry is widespread and is such that would 'be reasonably certain to prevent a fair trial.' " Mueller v. Commonwealth, 244 Va. 386, 398, 422 S.E.2d 380, 388 (1992) (citing Stockton

18

v. Commonwealth, 227 Va. 124, 137, 314 S.E.2d 371, 380 (1984)).

In considering evidence of community prejudice based on pretrial publicity, widespread knowledge of the case alone is insufficient to overcome the presumption.  Jurors need not be ignorant of the crime.  Irvin v. Dowd, 366 U.S. 717, 722 (1961); Buchanan v. Commonwealth, 238 Va. 389, 406, 384 S.E.2d 757, 767 (1989).  In addition to the volume of publicity, factors identified as relevant in determining the impact of pretrial publicity on the defendant's ability to obtain a fair trial are whether the publicity is accurate, temperate, and non-inflammatory, and the timing of the publicity.  Id. at 407, 384 S.E.2d at 769; Greenfield v. Commonwealth, 214 Va. 710, 717, 204 S.E.2d 414, 419-20 (1974).  Thus, publication of matters concerning the crime, the accused's prior criminal record, and even a confession of the accused, if factually accurate and non-inflammatory, is not improper and will not alone support a change of venue.  Id., 204 S.E.2d at 420.

A potential juror who has knowledge of the case, even if such person has formed an opinion about the case, is entitled to sit on the jury if that opinion can be set aside.  Irvin, 366 U.S. at 722-23.  But the difficulties that the trial court encounters when finding jurors who, despite having advanced knowledge of the case and, perhaps, even preformed opinions,

19

can impartially judge the case are relevant to deciding a motion to change venue.  The ease with which an impartial jury can be selected is a critical element in determining whether the prejudice in the community stemming from pretrial publicity is so wide-spread that the defendant cannot get a fair trial in that venue.  Roach v. Commonwealth, 251 Va. 324, 342, 468 S.E.2d 98, 109 (1996); Mueller, 244 Va. at 398, 422 S.E.2d at 388.  Thus, generally it will be necessary for a trial court to undertake the task of attempting to seat the jury.  Coppola v. Commonwealth, 220 Va. 243, 248, 257 S.E.2d 797, 801 (1979).[6]

We now apply these principles to the instant case.  As the trial court acknowledged, the amount of publicity surrounding this case was significant. While Thomas does not challenge the accuracy of any of these reports, he does cite three specific reports that he asserts were intemperate or inflammatory.  In two of these televised interviews Thomas was described as "obsessive and unbalanced" and the interviewee stated that the end of Thomas' relationship with his former girlfriend just before Tara's disappearance, "may have pushed him over the edge."  The interviewee also stated that Thomas

---

[6] There are circumstances in which the pretrial publicity " 'involves such a probability that prejudice will result that it is deemed inherently lacking in due process,' " and the defendant is not required to establish identifiable prejudice. Wansley v. Commonwealth, 210 Va. 462, 468-69, 171 S.E.2d 678,

20

had a motive to harm Tara Munsey because she was engaged to the son of Thomas' former girlfriend.

In the other television interview, the reporter identified a woman who claimed that Thomas "had threatened her life." The reporter went on to state that "Thomas' temper and short fuse kept [the woman] in fear of her life. A fear that isn't completely gone even though Thomas remains behind bars."

Thomas also asserts that there were inaccuracies in some of the 111 newspaper articles reporting on the crime and trial that were prejudicial to Thomas. One article reported that a search warrant for Thomas' person and car led to the discovery of a .22 caliber Marlin rifle, "which authorities believe was used in the murder." Similarly one headline stated "Police tie bullet to murder suspect" when in fact the bullets found could not be linked to Thomas. Retractions of these statements were subsequently published.

Certainly the volume of the pretrial publicity was extensive. The tenor of the publicity went beyond dispassionate reporting of the events surrounding the crime, the victim, and the accused, even though it did not declare the accused guilty or call for his conviction or for a specific punishment. Compare Irvin, 366 U.S at 725. Further, the

---

683 (1970) (quoting Estes v. Texas, 381 U.S. 532, 542-43 (1965)).

21

inaccuracies are additional persuasive evidence of the existence and development of community prejudice against Thomas.

Even in light of the volume and nature of the pretrial publicity in this case, the trial court was correct in proceeding to engage in voir dire. Such publicity was not so inaccurate, inflammatory or extensive that the trial would be deemed inherently lacking in due process. Accordingly, the trial court correctly took the matter under advisement until the voir dire process. However, when it finally denied the motion to change venue, the trial court concluded that the only relevant fact remaining to be considered was that it had ultimately seated an impartial jury. The record contains no indication that the trial court considered any other factor when making its decision to deny the motion to change venue. This is an improper test.

While this Court has included statements regarding the impartiality of the jury actually seated when discussing the relative ease of seating the jury, it is the ease of seating the jury that is the relevant factor, not the ultimate result of that process. Never has this Court held the impartiality of the seated jury to be a factor in considering whether a motion for a change of venue should be granted, much less found it dispositive. See, e.g., Mueller, 244 Va. at 398-99,

422 S.E.2d at 388-89; Greenfield, 214 Va. at 717, 204 S.E.2d at 420; Wansley v. Commonwealth, 210 Va. 462, 468, 171 S.E.2d 678, 683 (1970).

This principle is consistent with that announced by the United States Supreme Court. In Irvin v. Dowd, although a significant percentage of jurors were struck for cause and had pre-formed opinions of the defendant's guilt, the trial court was able to seat a jury that it judged would be impartial. Irvin, 366 U.S. at 727. The United States Supreme Court reversed, however, holding that given the difficulty of impaneling the jury and the evident influence of publicity on the jury pool, the trial court's finding of impartiality failed to make it reasonably certain that the defendant would get a fair trial and, therefore, a change of venue was necessary. Id. at 727-28.

Measuring the ease of impaneling a jury is an important tool in considering a request for change of venue. It allows the trial court to take into account a cross section of the community so as to understand the pervasiveness of prejudice. It also allows the trial court to keep in mind that justice must not only be fair, it must also be above suspicion, Breeden v. Commonwealth, 217 Va. 297, 298, 227 S.E.2d 734, 735 (1976) (citing Wright v. Commonwealth, 73 Va. (32 Gratt.) 941, 943 (1879)), because the more difficult it is to seat a jury,

23

the more likely it is that the public will believe the judicial process to be tainted by prejudice. While both victims and society have an interest in punishing those individuals who violate our criminal statutes, no one's interests are served when the process by which a defendant is found guilty is not above suspicion. The fairness of a criminal proceeding cannot be sacrificed because of the "heinousness of the crime charged, the apparent guilt of the offender or the station in life which [the defendant] occupies." Irving v. Dowd, 366 U.S. 717, 722 (1961).

Accordingly, we conclude that the trial court erred, as a matter of law, by failing to apply the proper test and failing to consider the necessary factors when making its decision to deny Thomas' motion to change venue. Consequently, because the trial court used an improper legal standard in exercising its discretionary function, we are unable to apply the appellate review standard of abuse of discretion. In light of this holding, the judgment of conviction must be vacated. While this disposition eliminates the need for us to address many of Thomas' remaining assignments of error, we will address one assignment of error that is likely to arise again in the event of retrial.

VII.  VICTIM IMPACT TESTIMONY

In Assignment of Error 33, Thomas asserts the trial court erred in allowing Ella Buchanan, a cousin of the victim, and Nicholas Ryan Zaroba, the victim's fiancé, to testify in the penalty phase of the trial because such testimony violated the provisions of Code § 19.2-264.4.  Thomas failed to object to the introduction of such testimony until July 9, 2001, four months after the penalty hearing.  The trial court noted that Thomas failed to comply with the contemporaneous objection requirement, Rule 5:25, but addressed the matter nevertheless, concluding that the testimony of these two witnesses did not violate the provisions of Code § 19.2-264.4.  Because the trial court considered the matter on its merits, we will address the issue.

Code § 19.2-264.4 allows victims to testify regarding the impact of the offense upon them.  The General Assembly has defined "victim" to include "a spouse, parent, sibling or legal guardian" of the murder victim.  Code § 19.2-11.01(B).

In Beck v. Commonwealth, 253 Va. 373, 484 S.E.2d 898 (1997), we considered whether the trial court erred in considering written communications from persons who where not family members of the victims in conjunction with the sentencing of the defendant in a capital murder bench trial.  The defendant argued that victim impact evidence in a capital murder case was limited to persons defined as "victims" by

Code § 19.2-11.01.  We rejected this argument finding that the statutes at issue, Code §§ 19.2-11.01, -264.5, and -299.1, did not limit evidence of victim impact to that received from the victim and family members.  The reference to the definition of "victim" in Code § 19.2-299.1 served only to identify the individuals whose consent was required for the inclusion of a victim impact statement in the presentence report prepared in non-capital cases.  Code § 19.2-264.4.

In 1998, subsequent to our decision in Beck, the General Assembly amended Code § 19.2-264.4 by adding the subsection at issue in this case, subsection (A1).  That subsection provides:

> In any proceeding conducted pursuant to this section, the court shall permit the victim, as defined in § 19.2-11.01, upon the motion of the attorney for the Commonwealth, and with the consent of the victim, to testify in the presence of the accused regarding the impact of the offense upon the victim.  The court shall limit the victim's testimony to the factors set forth in clauses (i) through (vi) of subsection A of § 19.2-299.1.

Unlike the statutes considered in Beck, this subsection specifically limits a "victim" to one meeting the definition contained in Code § 19.2-11.01 and specifically limits the testimony of such individuals to those items enumerated in subsection A of Code § 19.2-299.1.  The issue now before us then is whether the enactment of subsection (A1) of Code

26

§ 19.2-264.4 precluded all persons not coming within Code § 19.2-11.01's definition of "victim" from testifying in a capital murder proceeding regarding the crime's impact on their lives.  We conclude that this subsection does not so limit victim impact testimony in capital cases.

In Beck, we observed that the Victim Witness Rights Act, Code §§ 19.2-11.01 through -11.4, preserves the victims' right to have the impact of a crime considered in the sentencing proceeding.  253 Va. at 384, 484 S.E.2d at 905.  However, prior to 1998, the statutes only addressed this right in terms of the pre-sentence or written report.  See Code §§ 19.2-11.01(A)(4)(a), -264.5, -299.1.  The 1998 General Assembly added the subsection at issue in this case along with Code § 19.2-295.3 and subsection (c) of Code § 19.2-11.01(A)(4).[7]

---

[7] Code § 19.2-11.01(A)(4)(c):

> On motion of the attorney for the Commonwealth, victims shall be given the opportunity, pursuant to §§ 19.2-264.4 and 19.2-295.3, to testify prior to sentencing of a defendant regarding the impact of the offense.

Code § 19.2-295.3:

> In cases of trial by jury or by the court, upon a finding that the defendant is guilty of a felony, the court shall permit the victim, as defined in § 19.2-11.01, upon motion of the attorney for the Commonwealth, to testify in the presence of the accused regarding the impact of the offense upon the victim.  The court shall limit the victim's testimony to the factors set forth in clauses (i)

27

These amendments specifically addressed testimony by a victim and preserved the victim's right to present oral testimony. While the written statements were generally available only to the judge in the sentencing process, these amendments allowed the victim testimony to be presented to and considered by the jury in its sentencing deliberations.  This right to testify is, by statute, restricted to persons meeting the definition of "victim" in Code § 19.2-11.01.

Nothing in the subsection, however, supports the theory that other persons who may have relevant victim impact testimony may not testify.  While such persons do not have a statutorily protected right to testify, their testimony is not automatically barred by Code § 19.2-264.4(A1).  As we said in Beck, the statutes

> do not limit evidence of victim impact to that
> received from the victim's family members.  Rather,
> the circumstances of the individual case will
> dictate what evidence will be necessary and
> relevant, and from what sources it may be drawn.  In
> a capital murder trial, as in any other criminal
> proceeding, the determination of the admissibility
> of relevant evidence is within the sound discretion

---

> through (vi) of subsection A of § 19.2-299.1.  In
> the case of trial by jury, the court shall permit
> the victim to testify at the sentencing hearing
> conducted pursuant to § 19.2-295.1 or in the case
> of trial by the court, the court shall permit the
> victim to testify before the court prior to the
> imposition of a sentence.  Victim impact testimony
> in all capital murder cases shall be admitted in
> accordance with § 19.2-264.4.

28

of the trial court subject to the test of abuse of that discretion.

253 Va. at 384-85, 484 S.E.2d at 905.

Accordingly we reject Thomas' assertion that the trial court violated Code § 19.2-264.4(A1) when it allowed Buchanan and Zaroba to testify in the penalty phase of Thomas' capital murder trial.

Because Thomas does not assign error to the admission of this testimony on the ground that the testimony was not relevant, and because the substance of such testimony may be different in the event of retrial, we need not address Thomas' arguments regarding the substance of the challenged testimony.

CONCLUSION

For the reasons stated, we will vacate the conviction of the defendant and remand the case for further proceedings, should the Commonwealth be so advised, consistent with this opinion.

Record No. 012253 – Reversed and remanded.
Record No. 012254 – Reversed and remanded.