COURT OF APPEALS OF VIRGINIA

Present:    Chief Judge Decker, Judges Humphreys and O'Brien
Argued by videoconference


JAMES A. FIELDS, S/K/A
  JAMES ALEX FIELDS

v.      Record No. 1964-19-2

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE ROBERT J. HUMPHREYS
NOVEMBER 16, 2021

FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
Richard E. Moore, Judge

Denise Y. Lunsford (John I. Hill; Denise Y. Lunsford, LLC;
PoindexterHill, P.C., on brief), for appellant.

Rosemary V. Bourne, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


On August 12, 2017, James Fields ("Fields") drove a car into a group of pedestrians in

downtown Charlottesville, Virginia, killing one person and injuring others.  He was charged with

one count of first-degree murder, in violation of Code § 18.2-32, three counts of malicious

wounding, in violation of Code § 18.2-51, five counts of aggravated malicious wounding, in

violation of Code § 18.2-51.2, and one count of leaving the scene of an accident, in violation of

Code § 46.2-894.[1]  Following a jury trial in the circuit court of the City of Charlottesville ("the

circuit court"), Fields was found guilty on all counts.  On appeal, Fields argues that the circuit

court erred by denying his motion to change venue.  Fields also asserts that the circuit court erred

by admitting into evidence a meme Fields sent to a friend and another in the form of a post made

---

[1] Fields was originally indicted by a grand jury on three counts of aggravated malicious wounding and five counts of malicious wounding.  The Commonwealth later amended two of the malicious wounding charges to aggravated malicious wounding.  The propriety of those amendments is not before us.

on the social network Instagram.  He further assigns error to the admission into evidence of a photo of Adolf Hitler that Fields texted to his mother.  Finally, he asserts that the circuit court erred by admitting transcripts of a phone conversation between Fields and his mother into evidence.

## I.  BACKGROUND

On August 12, 2017, a rally titled "Unite the Right," occurred in Charlottesville.  The rally's stated purpose was protesting the removal of a Confederate statue from a city park.  Fields traveled from Ohio to attend the rally and was captured on video marching and chanting, "Jews will not replace us; you will not replace us, you will not replace us."

Later in the day, a group of counter-protestors began marching in downtown Charlottesville.  Fields first drove his car toward the group of counter-protestors, stopped, and reversed his vehicle away from the crowd; however, minutes later, he accelerated forward rapidly and drove his vehicle directly into the crowd of counter-protestors, striking several people, causing some to fly up into the air, and running over others.  One of them, Heather Heyer ("Heyer"), died as a result of injuries she sustained after being struck by Fields' car, and eight other people were seriously injured.  Immediately after hitting the pedestrians and another vehicle, Fields reversed his vehicle away from the intersection, hitting another person in the process, before driving away.

As stated, Fields was indicted on multiple charges, including first-degree murder.  On August 14, 2018, Fields filed a motion for a change of venue.  He attached 139 exhibits to his motion, all of which were news stories about the events that occurred on August 12, 2017. Fields argued that an extraordinary amount of media attention had focused on the charges against Fields and on the victims.  He also argued that the community of Charlottesville had been traumatized by the events, and as a result, although he was entitled to due process through an

- 2 -

impartial trial under the United States Constitution and the Constitution of Virginia, the local prejudice against him was so extraordinary that he could not receive a fair trial in Charlottesville. The circuit court took Fields' motion for a change of venue under advisement.

Fields' jury trial began on November 26, 2018, and he pled not guilty to all charges. On the first day of the trial, Fields submitted a supplement to his first motion for a change of venue, citing fifty-eight additional media reports that had been published since he filed his first motion.[2] The circuit court kept Fields' motion for a change in venue under advisement pending *voir dire* of prospective jurors.[3]

Jury selection began on the first day of the trial and filled approximately twenty-seven to twenty-eight hours over three days. Sixteen people—twelve to serve as jurors and four to serve as alternates—were ultimately chosen and sworn in. Fields then renewed his first motion for a change of venue, which the circuit court denied.

At trial, the Commonwealth argued that Fields drove his car into the counter-protestors out of hate for their ideology. In support of that theory regarding Fields' motive, the Commonwealth introduced, *inter alia*, two images or "memes"[4] into evidence that Fields had circulated to an acquaintance and on the social media site Instagram a few months prior to the incident in Charlottesville. Both memes depicted a motor vehicle violently driving into a group

---

[2] Fields also filed a second motion for a change of venue on November 26, 2018, based on different and distinguishable legal grounds from his first motion and supplement. He asserted that his case met the requirements for a mandatory venue change under Code § 19.2-251. The circuit court rejected that argument and denied his second motion. On appeal, Fields has abandoned the arguments he advanced in his second motion for a venue change. Therefore, we only address the arguments from his first motion.

[3] Literally translated from Latin as "speak the truth," *voir dire* is the process of questioning prospective jurors under oath.

[4] As the term is generally used in our current information age culture, a "meme" is typically an image or video, that enough people find amusing or interesting, that it is spread widely through sites on the internet.

of pedestrians, running some over, and flinging others into the air, because the driver was "late for work." The images included the captions, "When I see protestors blocking" and "You have the right to protest, but I'm late for work." In May of 2017, Fields sent one of these images via a private message to another user and a few days later, he posted the second meme to his public page on Instagram.

At trial, Fields asserted that the memes were irrelevant because he sent or posted them three months prior to his crimes in Charlottesville. He also argued that their relevance was substantially outweighed by their danger for unfair prejudice and, as such, they should be excluded under Virginia Rule of Evidence 2:403(a)(i). The Commonwealth argued that the memes were evidence that Fields possessed the requisite specific intent to drive into the protestors and, as such, the probative value of the memes was not substantially outweighed by their danger for unfair prejudice. It also contended that the remoteness of the posts could go toward the weight of the evidence; however, the elapsed time between when Fields posted the memes and when he drove his car into the crowd, in and of itself, did not make the memes irrelevant regarding his intent.

The circuit court heard arguments on the motion and reviewed precedent submitted by the parties before ruling that the memes were admissible.

The Commonwealth also submitted a motion *in limine* at trial to admit text messages and an attached photo of Adolf Hitler into evidence. The text messages took place between Fields and his mother. Fields texted her and said, "I got the weekend off, so I'll be able to go to the rally." The day before the rally, Fields' mother replied, "Be careful." Fields messaged her again and said, "We're not the one[s] who need to be careful." He attached a photo of Adolf Hitler to his last text message. Fields did not object to admitting the text messages, but he did object to admitting the accompanying image of Hitler.

The Commonwealth argued that the image of Hitler was particularly relevant and probative of Fields' intent, motive, and state of mind because he sent the image one day prior to committing his crimes in Charlottesville. The Commonwealth also argued that the image of Hitler was relevant because, as an attachment, it provided necessary context to the message he texted his mother, "We're not the one[s] who need to be careful." It asserted that the image was probative of Fields' intent and state of mind as related to "perceived political and ideological opponents he expected to be . . . present at the rally the very next day" and that significant probative value was not outweighed by a danger of unfair prejudice.

Fields argued that because Hitler is one of the most hated men in the history of western civilization, the probative value of the image was substantially outweighed by its unfairly prejudicial impact on his defense. The circuit court noted Fields' exception, and the image of Hitler was admitted into evidence with the text messages.

The Commonwealth also introduced, over Fields' objection, two taped phone conversations between Fields and his mother that occurred while Fields was confined pending trial. On the calls, Fields specifically referred to the events of August 12, 2017, and discussed the counter-protestors. The Commonwealth argued that the calls illustrated Fields' feelings and thoughts regarding the events of August 12, 2017, as well as his lack of remorse about them and, as such, the calls were relevant to show Fields' intent when he drove his car into the protestors.

On one call, Fields stated that he had not done anything wrong. He told his mother that he had been "mobbed by a violent group of terrorists" on August 12 and that he simply acted in self-defense. He also told his mother that the counter-protestors were waving the ISIS flag on the day of the attack and that the counter-protestors were communists. On the second call, Fields specifically called Heyer's mother an anti-white communist and referred to her as "the enemy." The circuit court allowed partially redacted recordings of both calls to be admitted into evidence.

The trial concluded on December 7, 2018. The jury found Fields guilty of one count of first-degree murder, three counts of malicious wounding, five counts of aggravated malicious wounding, and one count of leaving the scene of an accident. Fields was sentenced to life in prison plus 419 years and a fine.

Fields assigns four errors to the circuit court. His first assignment of error centers around his denied motions for a change of venue. His remaining three assignments of error all relate to evidence that the circuit court admitted over Fields' objections that it was unfairly prejudicial.

## II. ANALYSIS

### A. CHANGE OF VENUE

#### Standard of Review

"Change of venue is within the sound discretion of the trial court, and refusal to grant it will not constitute reversible error unless the record affirmatively shows an abuse of discretion." Stockton v. Commonwealth, 227 Va. 124, 137 (1984). When reviewing motions to change venue, "appellate courts begin with the presumption that the defendant can receive a fair trial from the citizens of the jurisdiction where the offense occurred." Brown v. Commonwealth, 68 Va. App. 746, 776-77 (2018). The defendant bears the burden of overcoming the presumption of a fair trial; he must "clearly show" that "there is such a widespread feeling of prejudice on the part of the citizenry as will be reasonably certain to prevent a fair and impartial trial." Id. at 777 (quoting Stockton, 227 Va. at 137). A showing of either extensive publicity or widespread knowledge of the crime or the defendant is insufficient, on its own, to justify a change of venue. Stockton, 227 Va. at 137.

Venue Analysis

Fields asserts that the trauma to the Charlottesville community, coupled with the significant pretrial publicity that his case received, impaired his constitutional right to have his case heard by an impartial jury.

The Sixth Amendment of the United States Constitution grants criminal defendants the right to trial by an impartial jury in both federal and state courts. U.S. Const. amend. VI ("[T]he accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed . . . ."); Duncan v. Louisiana, 391 U.S. 145, 149 (1968). The Constitution of Virginia also grants criminal defendants the right to trial "by an impartial jury of his vicinage." Va. Const. art. I, § 8. Pursuant to these constitutional protections, it is the circuit court's duty to empanel jurors who are free from bias and prejudice against the defendant. See Bay v. Commonwealth, 60 Va. App. 520, 530 (2012). The law presumes that a defendant will receive a fair trial in the jurisdiction where he committed the alleged offenses, and he bears the burden of overcoming that presumption "by demonstrating that the feeling of prejudice on the part of the citizenry is widespread and is such that would 'be reasonably certain to prevent a fair trial.'" Thomas v. Commonwealth, 263 Va. 216, 230 (2002) (quoting Mueller v. Commonwealth, 244 Va. 386, 398 (1992)). The defendant may make a motion to change venue but whether to grant that motion is within the sound discretion of the circuit court. See Stockton, 227 Va. at 137. The General Assembly codified the broad discretion given to circuit courts regarding venue in criminal cases as follows: "A circuit court may, on motion of the accused or of the Commonwealth, for good cause, order the venue for the trial of a criminal case in such court to be changed to some other circuit court." Code § 19.2-251.

Fields asserts that community trauma in Charlottesville was too great for him to receive a fair trial but he cites no binding or even persuasive authority holding that "community trauma" is

a standard that a circuit court should consider when assessing the appropriateness of a change of venue, nor is this Court aware of such authority. We have previously held that, "[i]n determining whether community prejudice against the defendant is sufficiently pervasive to preclude a fair trial and justify a change in venue, *the primary inquiry* is the ease with which an impartial jury can be selected." Brown, 68 Va. App. at 777 (emphasis added). Ease of seating an impartial jury is an essential factor for determining whether a defendant can receive a fair trial because "the relative ease of seating an impartial jury negates the existence of the 'widespread prejudice' which a criminal defendant must show to justify a change in venue." Id. (quoting Buchanan v. Commonwealth, 238 Va. 389, 407 (1989)). The volume and timing of publicity—and the accuracy of that publicity—are pertinent, but not ultimate, concerns on a motion to change venue. See id. at 778. Moreover, presumably, to the extent that an entire community was "traumatized" as a result of a criminal act or acts, it is reasonable to expect that such trauma would be reflected in widespread prejudice in the pool of prospective jurors and revealed during the selection process. In summary, whether to grant a venue change is not merely a mathematical calculation based on the number of prospective jurors considered and length of *voir dire*, but rather, a careful judicial review and analysis of the "totality of the surrounding facts." Id. at 781 (quoting Irvin v. Dowd, 366 U.S. 717, 721 (1961)).

Applying these principles to the case at hand, Brown v. Commonwealth is instructive and relevant because Brown addressed strikingly similar change of venue issues and was decided by this Court only three years ago. Id. at 746. In that case, the appellant shot and killed a Virginia state trooper in Dinwiddie County and shot at two other individuals, including a second Virginia state trooper. Id. at 758-62. Brown was tried and convicted in Dinwiddie County of capital murder, attempted capital murder, and attempted murder, among other charges. Id. at 757. Prior

to his trial, Brown moved to change venue, citing the extensive media coverage of the murder and the "closeness of the Dinwiddie community." Id. at 763. His motion was denied. Id.

Regarding the ease with which the jury was seated, jury selection in Brown's case took six days; the circuit court questioned one hundred and twenty prospective jurors in order to form a pool of twenty-eight from which twelve jurors and four alternates were selected. Id. At the close of jury selection, as in Fields' case, Brown renewed his motion to change venue. Id. at 766. The circuit court noted that media publicity and Brown's proposed insanity defense to his capital murder charge had necessitated a longer, slower jury selection process. Id. The circuit court stated, "I don't think I can approach this mechanically and say if the level of people who know is X percent, then I will automatically grant the motion." Id. at 782. Instead, the circuit court considered why the selection process took so many days and why it was necessary to consider many jurors. Id. The circuit court stated it had been deliberately "thorough and careful" during jury selection because the case involved "multiple considerations." Id. The circuit court ultimately denied Brown's renewed motion for a change of venue. Id. at 766. On appeal, this Court affirmed the circuit court, finding that it had "conducted a deliberate and thoughtful *voir dire* in order to seat an appropriate jury" and, as a result, the circuit court did not abuse its discretion by denying change of venue. Id. at 783.

Here, just as in Brown, the circuit court conducted a deliberate and thoughtful *voir dire* in order to seat an appropriate jury. In the instant case, the circuit court chose a *venire* of 360 jurors. Prior to in-person *voir dire* at the courthouse, counsel for Fields and the Commonwealth jointly drafted a questionnaire, which was sent to each potential juror. Copies of the completed questionnaires were given both to the Commonwealth and to counsel for Fields to review before *voir dire*. Forty-three initial jurors were disqualified by agreement between counsel based on those prospective jurors' disclosures in the questionnaire. Disqualifying disclosures included

donating to a "Heal Charlottesville Fund," fundraising for a cause closely associated with the events of August 12, 2017, and assertions of belief that Fields' actions were terrorism and that he was a terrorist.

The record reflects appropriately extensive questioning by the court, the defense attorneys, and the prosecutor. The transcription of *voir dire* fills well over one thousand pages. The circuit court asked potential jurors whether they knew anything about the facts of the case from speaking to eyewitnesses. The circuit court also asked how many people knew anything about the alleged facts of the case based on coverage in the news media. The circuit court then asked questions designed to reveal whether potential jurors could be impartial factfinders, inquiring about the weight jurors might give to police officer testimony, whether the jurors could treat someone who holds extreme political views fairly, and whether they could put media accounts of the events of August 12, 2017, "out of their mind" and listen solely to the evidence presented in the courtroom. After the circuit court finished questioning a group of possible jurors, attorneys for both parties conducted individual *voir dire*.

The circuit court noted that it normally would summon thirty to forty jurors for a regular, non-publicized felony trial and in Fields' case they went through seventy-five jurors to get an adequate jury. The circuit court stated, "I don't think that's unreasonable. It's just barely less, it's less than double the upper limit of what we normally call in. And I think that's certainly not unduly difficult." The circuit court also stated that it gave the attorneys more "leeway in questioning" and that the whole process was "the most extensive, thorough, detailed, and careful *voir dire* that I've ever participated in." Only seventy-five jurors were needed to seat a panel of twenty-eight. Jury selection in the present case took only half the time, three days, that it did in Brown, which required six days. Just as in Brown, here, the circuit court took great time and

- 10 -

care, as evidenced by its thorough questioning, in ensuring that an impartial jury was able to be seated.

Regarding the nature of the coverage, on brief, Fields argues extensively that pretrial publicity and community trauma required the circuit court to grant the motion to change venue. Importantly, in considering evidence of community prejudice based on publicity and media reports, widespread knowledge of the case alone is insufficient to overcome the presumption that the defendant will receive a fair trial. Thomas, 263 Va. at 230. "A potential juror who has knowledge of the case, even if such person has formed an opinion about the case, is entitled to sit on the jury if that opinion can be set aside." Id. at 231.

Irvin v. Dowd, whose reasoning this Court found instructive in Brown, and which applies with equal force here, states,

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

366 U.S. at 722-23.

Therefore, sheer volume of publicity is not sufficient, in and of itself, to justify a change of venue, particularly given the prolific volume of news available in the age of the internet. The circuit court pointed out that "most of the news reports [about August 12, 2017] are carried by national news agencies, the Washington Post, New York Times, CNN, and MSNBC . . . and I'm thinking where could you go that people wouldn't be privy to that?" The circuit court below correctly determined that under Brown and Irvin, while the volume and timing of publicity does

- 11 -

matter, it is not the ultimate concern in assessing whether a change in venue was appropriately denied.

Additionally, whether the publicity surrounding a defendant's alleged crimes is accurate, temperate, and noninflammatory is a "pertinent [concern] in assessing whether a change in venue was appropriately denied." See Brown, 68 Va. App. at 778. The shocking nature of a reported crime does not render the news article itself inherently inflammatory. See LeVasseur v. Commonwealth, 225 Va. 564, 578 (1983). Articles that accurately report the facts, despite how shocking the facts are, will not be considered inflammatory. See id. Here, the circuit court reviewed the news articles submitted by Fields on his motion for a change of venue and said, "My findings would be that most of the news articles, certainly not necessarily all of them, but most of them were factual in nature and accurate. Most of them were not inflammatory, with a few exceptions. The photos presented are inherently accurate because they are photographs of what's happening."

Instead of focusing solely on publicity, the circuit court correctly assessed the *totality* of the surrounding facts in Fields' case, which revealed that jury selection here was even shorter and less difficult than in Brown. The record supports the circuit court's conclusion that selecting jurors willing to honor their oath to keep an open mind and follow the court's instructions was relatively easy, that the publicity was accurate and noninflammatory, and that there was not such widespread prejudice against Fields that he could not obtain an impartial jury. For these reasons, we hold that the circuit court did not err in denying Fields' motion for a change in venue.

## B. EVIDENTIARY ISSUES ON APPEAL

### Standard of Review

"Given the 'broad discretion' of a trial judge over evidentiary matters, we apply a deferential abuse-of-discretion standard of appellate review." Thomas v. Commonwealth, 44

Va. App. 741, 753 (quoting Seaton v. Commonwealth, 42 Va. App. 739, 752 (2004)), adopted upon reh'g en banc, 45 Va. App. 811 (2005). A court can abuse its discretion in three ways: (1) by failing to consider a relevant factor that should have been given significant weight, (2) by considering and giving significant weight to an irrelevant or improper factor, and (3) when the circuit court, while weighing "all proper factors," commits a clear error of judgment. See Lawlor v. Commonwealth, 285 Va. 187, 213 (2013). That standard means that the circuit court judge's "ruling will not be reversed simply because an appellate court disagrees." Thomas, 44 Va. App. at 753. An abuse of discretion does not occur if reasonable jurists could differ. See id.

Additionally, we view the evidence in the light "most favorable to the Commonwealth as the prevailing party on this issue in the circuit court." Grattan v. Commonwealth, 278 Va. 602, 617 (2009).

### The Protest Memes

On appeal, Fields alleges that the circuit court erred by allowing the two protest memes to be admitted into evidence over his objection. He does not contest the memes' relevance but contends that they were unfairly prejudicial. Relevant evidence may be excluded if "the probative value of the evidence is substantially outweighed by . . . the danger of unfair prejudice." Va. R. Evid. 2:403(a)(i). The fact that evidence is highly prejudicial to a party's claim or defense, in and of itself, "is not a proper consideration in applying the balancing test." Lee v. Spoden, 290 Va. 235, 252 (2015). Instead, the circuit court must determine whether the probative value of the evidence is *substantially* outweighed by its unfair or unduly prejudicial effects. See id.

"All evidence tending to prove guilt is prejudicial to an accused, but the mere fact that such evidence is powerful because it accurately depicts the gravity and atrociousness of the crime or the callous nature of the defendant does not thereby render it inadmissible." Powell v.

- 13 -

Commonwealth, 267 Va. 107, 141 (2004). Rule 2:403's requirement that only *unfair* prejudice may be considered as grounds for non-admission "reflects the fact that all probative direct evidence generally has a prejudicial effect to the opposing party." Lee, 290 Va. at 251. Evidence must "inflame the passions of the trier of fact, or . . . invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case" in order to be classified as "unfairly prejudicial." See id. Put more succinctly, the nature of the evidence must be such that it generates such a strong *emotional* response that it is unlikely that the jury could make a *rational* evaluation of its proper evidentiary weight. Common examples of such evidence are particularly graphic crime scene or autopsy photos, which are *inherently* unfairly prejudicial because their shock effect prevents a layperson on a jury from being able to properly evaluate or weigh them in the context of the other evidence. Unlike those examples, the evidence being contested on appeal here did not contain any content that would inherently prevent jurors from rationally considering and weighing it with the other evidence. The contested evidence in this case was only prejudicial, if at all, in the context of the totality of all the circumstances surrounding the events that led to Fields' trial.

It is also true that "the responsibility for balancing the competing considerations of probative value and prejudice rests in the sound discretion of the trial court." Ortiz v. Commonwealth, 276 Va. 705, 715 (2008) (quoting Spencer v. Commonwealth, 240 Va. 78, 90 (1990)). Here, the circuit court applied Rule 2:403's balancing test correctly. The circuit court did not have to find that the memes were not prejudicial; it only had to find that the memes' probative value to the issues in the case was not substantially outweighed by a danger of unfair prejudice to Fields. When it held that the memes were admissible, the circuit court explained its reasoning and stated,

> It's a car running into protestors and that's the thing I couldn't get
> away from. . . . [I]t would be relevant if it shows it wasn't an

- 14 -

accident, if it shows he thought poorly of the protestors, all of that could go into his mental state or his intent and that's really what I couldn't get away from. . . . [C]learly intent is going to be an issue. The jurors have been told that and self-defense is a possible issue. I think it would be relevant to that . . . .

Because Fields was charged with first-degree murder under Code § 18.2-32, the Commonwealth had to prove that he willfully, deliberately, and premeditatively killed Heyer. "Premeditated murder . . . contemplates: (1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent." Rhodes v. Commonwealth, 238 Va. 480, 486 (1989). Because "premeditation and formation of an intent to kill seldom can be proved by direct evidence[,][a] combination of circumstantial factors may be sufficient." Aldridge v. Commonwealth, 44 Va. App. 618, 655 (2004) (alteration in original) (quoting Rhodes, 238 Va. at 486). Memes depicting a car driving destructively into a crowd of protestors constituted relevant circumstantial evidence that was probative of Fields' intent due to the memes' striking similarity to the act Fields committed. The defense itself stated during opening statements to the jury,

You're here because you need to decide—and I'm here because I need to show you—why this event took place. You need to decide and we need to show you was it an intended act, was it a malicious act, was it an act done with the intent or with the subjective belief [that] the actor, James, was in fear of serious bodily injury himself or even death . . . ?

Viewed in the light most favorable to the Commonwealth, the fact that Fields sent or posted two images involving the same type of violence that he later acted out demonstrates that the circuit court had a basis for believing that the memes had significant probative value. The memes' probative value was not substantially outweighed by unfairly prejudicial effects merely because they depicted the same level of gravity and atrociousness as the crime scene pictures depicting the results of Fields' actions. While the memes were undoubtedly prejudicial to Fields' claim of innocence, they did not inflame the jury's passions or invite decision based upon

- 15 -

an unrelated factor. Because Fields' intent was at issue in the case, the circuit court's finding

that the memes were probative, material, and relevant circumstantial evidence and thus

admissible, was not an abuse of discretion.

### The Hitler Image

Fields next—similarly—argues that the circuit court abused its discretion by admitting

the portrait-style photograph of Adolph Hitler because the photo's probative value was

"substantially outweighed" by its danger of unfair prejudice. Fields does not dispute the image's

relevance, asserting instead that it should have been excluded because its potential for unfair

prejudice outweighed its probative value. As stated above, relevant evidence may be excluded if

"the probative value of the evidence is substantially outweighed by . . . the danger of unfair

prejudice." Va. R. Evid. 2:403(a)(i).

Here, the circuit court explained its evaluation regarding the danger of unfair prejudice

not once, but twice, providing a robust record with which to review its reasoning. The record

demonstrates the circuit court's careful consideration of the arguments and balancing of the

image's potential prejudice with its probative value. The circuit court took great care to hear

both parties' arguments in full and even changed its proposed ruling after reading cases

submitted by counsel.[5] Further, after hearing the arguments and questioning the parties

---

[5] The cases submitted by the Commonwealth for their persuasive value were State v. Crumb, 704 A.2d 952 (N.J. Super. Ct. App. Div. 1997), and People v. Ritchie, No. B262575 (Cal. Ct. App. Jan. 17, 2017). In Crumb, a defendant with neo-Nazi ties was charged with first-degree murder for beating an elderly African-American man to death. The New Jersey court admitted evidence that illustrated the defendant's fondness for Adolf Hitler, neo-Nazis, and white supremacy because the court found that the evidence was probative to the defendant's alleged motive, white supremacy. In Ritchie, a defendant with white supremacist ties was charged with murdering a black victim on account of the victim's race. The trial court allowed the prosecution to present evidence of defendant's white supremacist beliefs, including defendant's respect for Adolf Hitler "because of the things that [Hitler] carried out" and "because of the power" that Hitler held. The trial court concluded that the challenged evidence tended "logically to explain why defendant would participate in a racially-motivated assault and

extensively, the circuit court explained its reasoning at length.  It noted that if the image of Hitler was unrelated to any issue in the case—for example, if Fields was charged with burglary or possession of pornography—it would have been excluded.

The circuit court acknowledged that the image of Hitler could be prejudicial but permitted it to be admitted into evidence for the purpose of determining Fields' intent, motive, and state of mind.  This Court has previously held that "[a]n essential element of a first-degree murder conviction is premeditation, *i.e.*, the development in the mind of the murderer of the specific intent to kill prior to the act itself."  Knight v. Commonwealth, 41 Va. App. 617, 623 (2003); see also Code § 18.2-32.  The circuit court held that other evidence introduced in the case, including that which showed Fields marching and chanting "Jews will not replace us," on the morning of the attack, reduced the prejudicial effects of the contested image of Hitler on Fields, as the circuit court explained at trial:

> As far as the prejudice goes, this is not a burglary or a pornography case where you just want to show "this guy likes Hitler."  I think [the Commonwealth] is correct.  This whole connection with white supremacy and the alt right, it's the core of this case and his thinking about it is . . . there's already evidence out there that he would be connected with the alt right white supremacists, and even Nazi sympathizers, so frankly, the prejudice in this case is muted because it's already in the case.  I mean, he's already walking with people saying, you know, "Jews will not replace us."  So it's not as if it's a great leap to say, well, he actually has a picture of Hitler on one of his messages.  The thing that did it for me is it's put there by him the day before this happened on a text message that says "We're not the ones who that need to be careful."  So one would have to say, well, I wonder what he's saying.  He's saying who needs to be careful.  Well, think about who needed to be careful with Hitler.

A simple portrait picture, such as was admitted in this case, of a person regarded by most people as despicable may or may not be relevant in a particular case, and if relevant, it would

---

murder."  On appeal, the appellate court determined the trial court did not abuse its discretion by admitting the evidence.

likely be prejudicial; however, assuming its relevance to an issue in the case, contrary to Fields' assertion, any prejudicial effect of such a picture would not necessarily substantially outweigh any probative value. In this case, the Commonwealth was arguing that Fields was motivated by hatred for ethnic and political groups when he ran his car into the counter-protestors. The image of Adolph Hitler had significant probative value. It was highly relevant because Fields' intent, motive, and state of mind were at issue. Conversely, Fields' argument is essentially that because the evidence was a picture of Adolf Hitler, that fact alone outweighed any conceivable probative value. Accordingly, and for the same reasons outlined above with respect to the admission of the memes into evidence, we conclude that the circuit court did not abuse it discretion by admitting this picture into evidence.

Because we find no abuse of discretion in admitting this image, we do not address the Commonwealth's harmless error argument.

<u>Jail Calls</u>

The circuit court held that the recordings of the calls between Fields and his mother made while Fields was in jail awaiting trial were admissible although it ordered that portions of them be redacted. The circuit court reasoned that the calls were probative because they revealed something about Fields' state of mind, intent, and whether he acted with malice. The circuit court held that the jury should be able to consider Fields' commentary regarding, *inter alia*, the events of August 12 and the counter-protestors.

On appeal, Fields does not specifically explain how the circuit court abused its discretion by admitting the calls into evidence or how the evidence unfairly prejudiced him. He argues only, "[w]ithout reciting the same the [a]ppellant incorporates this [a]ssignment of [e]rror the standard of review, the arguments, and the authorities set out in the previous two (2) [a]ssignments of [e]rror." Thus, Fields apparently implicitly asserts that the calls are "highly

prejudicial and only remotely probative of the elements of the offenses for which he was charged," but he does not explain the nature of the abuse of discretion he contends the circuit court committed. See Lawlor, 285 Va. at 213 (finding that a circuit court can abuse its discretion by failing to consider a relevant factor, by considering and giving significant weight to an irrelevant or improper factor, and by weighing "all proper factors," but committing a clear error of judgment).

Without a more definitive argument or explanation from Fields and given the circuit court's explicit explanation of its reasoning for admitting the audio calls into evidence, it is difficult to conclude that the circuit court abused its discretion. Because Fields' intent was at issue in the case, as discussed above, the phone calls were relevant because they tended to show his state of mind and lack of remorse. See Aldridge, 44 Va. App. at 655-56 ("Circumstantial factors that the fact finder may consider in deciding whether there is sufficient evidence of premeditation and a specific intent to kill include . . . the defendant's lack of remorse and efforts to avoid detection."). As the circuit court stated, "Both sides in this case have said that this case is essentially about what Mr. Fields was thinking at the time the events happened, what was inside his head." The phone calls were probative circumstantial evidence regarding Fields' intent. Regarding their potential for unfair prejudice, the circuit court considered the evidence and carefully weighed the prejudicial versus probative effect of playing the calls for the jury. Notably, the circuit court required the Commonwealth to edit out some of Fields' most inflammatory language from the recordings before playing the calls for the jury. The circuit court's careful weighing of both the probative and prejudicial effects of the calls is illustrated by its decision to redact portions because the language used was too unfairly prejudicial to Fields.

We may not hold that a circuit court abused its discretion regarding an evidentiary admission unless "reasonable jurists could not differ" with respect to its admissibility. See

<u>Dalton v. Commonwealth</u>, 64 Va. App. 512, 521 (2015).  Here, the purportedly unfair prejudicial effects of the admitted phone calls are not so apparent and substantial that reasonable jurists would all agree that the probative value of the evidence was substantially outweighed by the prejudicial nature of its content.  As a result, the circuit court did not abuse its discretion in admitting them.

III.  <u>CONCLUSION</u>

For all these reasons, we hold that the circuit court did not err by denying the motion to change venue or by admitting the memes, image of Adolf Hitler, and the recorded jail calls into evidence and the judgment of the circuit court is affirmed.

<u>Affirmed.</u>